**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **LM INSURANCE CORPORATION,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:22-cv-00917** |
| | § | |
| **THE CINCINNATI INSURANCE** | § | |
| **COMPANY,** | § | |
| **Defendant** | § | |

**ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff LM Insurance Corporation files this Original Complaint against The Cincinnati Insurance Company pursuant to 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 2201(a) and would show the Court the following:

**I.**
**PARTIES AND SERVICE**

1.    Plaintiff LM Insurance Corporation ("Liberty") is an insurance company duly organized and existing under the laws of the State of Illinois and with its principal place of business in the Commonwealth of Massachusetts.  Liberty was and is duly qualified to and does transact business in the State of Texas, and executes and delivers insurance policies throughout Texas, including Dallas County.

2.    Defendant The Cincinnati Insurance Company ("Cincinnati") is an insurance company duly organized and existing under the laws of the State of Ohio and with its principal place of business also in the State of Ohio.  Cincinnati is duly qualified to do and does transact business in the State of Texas, and executes and delivers insurance policies in Dallas County, Texas.  Cincinnati may be served with process through its agent for service, Steve Corbly, P.O.

Box 145496, Cincinnati, Ohio 45250-5496. Liberty requests that citation be issued and served upon this defendant.

## II.
## JURISDICTION AND VENUE

3.      This declaratory judgment suit is filed pursuant to 28 U.S.C. § 2201(a), which authorizes actions for declaratory judgment.  It also seeks damages for breach of contract and attorneys' fees for that breach.  This suit is within the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because it is between citizens of different states and the amount in controversy exceeds $75,000.  In connection with an underlying suit styled *Esteban S. Alvarez v. Venture Commercial Management, LLC, et al.,* Cause No.: CC-19-00837-c, in the County Court at Law No. 3, Dallas County, Texas (the "Underlying Suit"),  Liberty seeks a declaration of the rights and duties of the parties under a commercial general liability policy issued to Red Steel Company ("Red Steel") by Cincinnati (the "Cincinnati Policy").  A copy of excerpts of the Cincinnati Policy, no. EPP 015 49 26, is attached as Exhibit A.  Specifically, Liberty seeks a judgment declaring that, in the Underlying Suit, Cincinnati has a duty to defend and indemnify as an additional insured Rogers-O'Brien Construction Company, Ltd. ("Rogers-O'Brien"), a defendant therein and a Liberty policyholder.  In addition, Liberty seeks reimbursement of payments made by it to defend Rogers-O'Brien in the Underlying Suit, and an award of its own attorneys' fees (as well as costs) in this action.

4.      The applicable limit of liability of the Cincinnati Policy is $1 million, and the amount in controversy includes not only the cost of defending Rogers-O'Brien but also the potential cost of paying any judgment against it in the Underlying Suit, which amount thus exceeds the minimum jurisdictional limits of this Court.

5.      Venue is appropriate in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391(b)-(d), because Cincinnati is subject to the Court's personal jurisdiction and is therefore deemed to reside in this district.

6.      All persons having an interest in the outcome of this litigation have been joined as parties and there is no other pending legal action seeking to adjudicate the rights of the parties.  An actual controversy of a justiciable nature exists regarding the parties' rights and duties under the Cincinnati Policy in connection with the Underlying Suit. This action is necessary to determine Cincinnati's duty to defend and indemnify Rogers-O'Brien therein under the Cincinnati Policy.

## III.
## BACKGROUND

7.      On August 19, 2019, Esteban S. Alvarez filed in the Underlying Suit Plaintiff's Second Amended Petition (the "Petition"), a true and correct copy of which is attached hereto as Exhibit B.  Naming several defendants, including Rogers-O'Brien (identified therein alternately as "ROGERS" and "Rogers"), the Petition alleges in general Alvarez was injured when a "dumpster gate" fell on him at the premises he was patrolling as a security guard.  Specifically, the Petition includes the following allegations:

> 3.09    At the time of the incident made the basis of this lawsuit, Defendants VENTURE, ROGERS, RED STEEL, FAB-HAR and COMPASS, owned, installed, maintained, designed, manufactured and/or managed the dumpster gate which failed and injured [Alvarez] located at 8383 Preston Road, Dallas, Texas 75225, commonly known as THE PLAZA AT PRESTON CENTER. . . .

> 5.01.   On the morning of January 23, 2019, [Alvarez] was working as a security guard for the premises.  [He] was employed by United Protective Services.  During a routine perimeter check of the property, [he] was closing a[n] opened dumpster gate behind True Food Kitchen.  As [he] was closing the gate, it broke free and crushed [him].  [He] suffered severe injuries.

Ex. B, Petition at 4.

8.     With respect to Cincinnati's additional insured, Rogers-O'Brien, the Petition alleges in part as follows:

> 8.01     [It] was the general contractor in charge of the construction site at the Plaza at Preston Center which included the installation of the dumpster gate which failed and severely injured Plaintiff.  Plaintiff would show that Defendant Rogers is liable to Plaintiff for all or part of Plaintiff's claims for negligence and premises liability against Plaintiff because Defendant was negligent . . . .

*Id.* at 6.

9.     The Petition enumerates several forms of alleged negligence by Rogers-O'Brien including failing to install a safe dumpster gate on the premises, failing to follow proper plans, specifications, city ordinances and building codes in the manufacture and installation of the dumpster gates, and failing to hire competent subcontractors to perform work related to the dumpster gates which injured Plaintiff.  *Id.*  The Petition also alleges Rogers-O'Brien is liable for negligence and gross negligence.  *Id*. at 7.

10.     With respect to Cincinnati's named insured, Red Steel, the Petition alleges in part as follows:

> 9.01     Defendant Rogers, as the general contractor in control of the installation of the dumpster gate, contracted with Fab-Har, Red Steel and Compass to perform work related to the dumpster gates at issue in this lawsuit . . . .

> 9.02     At the instruction of Defendant Rogers, Defendants Fab-Har, Red Steel and Compass provided labor materials and equipment to manufacture and install the dumpster gates which failed and injured Plaintiff.

> 9.03     Plaintiff would show that Defendants Fab-Har, Red Steel and Compass are liable for all or part of Plaintiff's claims for negligence and premises liability against Plaintiff . . . .

*Id*.  The Petition enumerates various forms of alleged negligence by Red Steel as well as the other subcontractors and alleges they are liable for negligence and gross negligence.  *Id.* at 7-8.

**IV.**
**CAUSES OF ACTION**

11.     Liberty incorporates by reference the allegations set forth above.  Liberty seeks, by this action, a judgment declaring that, under the Cincinnati Policy, Cincinnati has a duty to defend Rogers-O'Brien in the Underlying Suit.  *See* Exhibit A.  Liberty also seeks to recover from Cincinnati the expenses Liberty has incurred in defending Rogers-O'Brien in the Underlying Suit and, pursuant to Texas Civil Practice and Remedies Code section 38.001, *et seq.*, its own attorneys' fees and costs in bringing this action for Cincinnati's breach of contract.  Liberty is entitled to such damages as Rogers-O'Brien's subrogee.

**A.     Breach of Contract and Contractual and Equitable Subrogation**.

12.     On information and belief, the Cincinnati Policy includes form GA 101 TX 09 10 (the "CGL Coverage Form"), which provides in part as follows:

**1.  Insuring Agreement**

   **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

Exhibit C, CGL Coverage Form at 1.

13.     On information and belief, the CGL Coverage Form of the Cincinnati Policy includes SECTION II - WHO IS AN INSURED.

*Id.* at 11.

14.     On information and belief, the Cincinnati Policy provides additional insured coverage under an endorsement titled "Contractors' Commercial General Liability Broadened Endorsement" (the "Contractors' Endorsement"), which provides in part as follows:

**C.  Coverages** . . . .

---

**9. Automatic Additional Insured - Specified Relationships**

    **a.** The following is hereby added to **SECTION II - WHO IS AN INSURED**:

        **(1)** Any person or organization described in Paragraph **9.a.(2)** below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under the Coverage Part by reason of:

            **(a)** A written contract or agreement . . . .

    is an insured . . . .

        **(2)** Only the following persons or organization are additional insureds under this endorsement, and insured coverage provided to such additional insured is limited as provided herein . . . [:]

            **(f)** Any person or organization with which you have agreed per Paragraph **9.a.(1)** above to provide insurance, but only with respect to liability arising out of "your work" performed for that additional insured by you or on your behalf. A person or organization's status as an insured under this provision of this endorsement continues for only the period of time required by the written contract or agreement, but in no event beyond the expiration of this Coverage Part. If there is no written contract or agreement, a person or organization's status as an insured under this endorsement ends when your operations for that insured are completed.

    15.    The Cincinnati Policy thus provides Rogers-O'Brien is Cincinnati's additional insured if Red Steel's subcontract with Rogers-O'Brien requires it. Entered into on September 9, 2011, the subcontract between Red Steel and Rogers-O'Brien (the "Red Steel Subcontract") designates Red Steel as "Subcontractor[,]" Rogers-O'Brien as "Contractor" and Caruth/Preston Road Associates as "Owner[.]" *See* Exhibit D, Red Steel Subcontract at 1. With respect to insurance coverage, paragraph 9.1 of Red Steel Subcontract provides as follows:

    9.1 Commercial General and Umbrella Liability Insurance. [Red Steel] shall maintain insurance coverages as defined in the Prime Contract but in no instance shall [Red Steel]'s insurance provide less coverage then the following:

---

(A)     CGL insurance shall be written on ISO occurrence form CG 00 01 10 (or a substitute form providing equivalent coverage) and shall cover liability arising from premises, operations, independent contractors, products-completed operations, personal and advertising injury and liability assumed under an insured contract (including the tort liability of another assumed in a business contract). . . .

(B)     [Rogers-O'Brien], Owner and their agents, officers, directors, employees and any other party required under the Prime Contract shall be included as an insured under the CGL using ISO additional insured endorsement CG 20 10 11 85 or a substitute providing equivalent coverage, and under the commercial umbrella, if any. This insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to [Rogers-O'Brien] or Owner. . . .

(C)     Continuing Completed Operations Liability Insurance. [Red Steel] shall maintain commercial general liability (CGL) and if necessary commercial umbrella liability insurance with a limit of not less than $1,000,000 each occurrence with coverage as specified in paragraph 9.1(A) for at least 2 years following substantial completion of the work.

*Id.* at 2-3.

16.     The Cincinnati Policy's Contractors' Endorsement thus extends additional insured coverage to a party with whom its named insured, Red Steel, enters into a contract requiring such coverage and the Red Steel Subcontract unambiguously requires Red Steel to provide such coverage to Rogers-O'Brien. The allegations of the Petition in the Underlying Suit are within the scope of coverage of the Cincinnati Policy. Accordingly, Rogers-O'Brien qualifies as an additional insured under the Cincinnati Policy and is entitled, retroactive to the date of first tender to Cincinnati by or on behalf of Rogers-O'Brien, to a complete defense thereunder in the Underlying Suit.

17.     Rogers-O'Brien has duly performed every covenant and satisfied every condition required of it as an additional insured under the Cincinnati Policy. In the alternative and as a result of Cincinnati's breach of duties under the Cincinnati Policy, including the duty to defend it,

Rogers-O'Brien is excused from performing any such covenant it has not performed and is excused from satisfying any such condition it has not satisfied.

### B.    Liberty Has Equitable and Contractual Rights of Subrogation

18.    As shown above, Cincinnati has a duty to defend Rogers-O'Brien in the Underlying Suit as an additional insured under the Cincinnati Policy.  As subrogee of Rogers-O'Brien, Liberty has equitable and contractual rights to enforce that duty against Cincinnati.

19.    As of the date of this pleading, Cincinnati has refused to acknowledge its contractual obligations to provide a defense to Rogers-O'Brien in the Underlying Suit and has refused to pay or reimburse any amount paid for such defense.  Cincinnati has admitted it did not defend or contribute to such defense and disputes that it has any duty to do so.  Each and every such refusal to defend constitutes a breach of Cincinnati's contractual duties under the Cincinnati Policy.

20.    As a direct and proximate result of Cincinnati's breach of its contractual obligations, Rogers-O'Brien has incurred substantial defense costs and other expenses, in amounts exceeding the jurisdictional limits of this Court, which costs and other expenses have been paid, in whole or part, by Liberty on behalf of Rogers-O'Brien.  Liberty thus has rights of contractual and equitable subrogation against Cincinnati for Cincinnati's failure to assume the defense of Rogers-O'Brien and/or to pay its defense costs in the Underlying Suit.  As contractual and equitable subrogee of Rogers-O'Brien, therefore, Liberty is entitled to recover any and all damages caused by Cincinnati's breach of its contractual duties to Rogers-O'Brien.

21.    By breaching its contractual duties, Cincinnati has waived defenses under the Cincinnati Policy and at law, and is estopped to assert that Rogers-O'Brien somehow has failed to comply with the Cincinnati Policy.

## V.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff LM Insurance Corporation prays that Defendant The Cincinnati Insurance Company be cited to appear and answer herein, and that on final hearing it have the following judgment:

1.    Declaring that Cincinnati has a duty to defend and indemnify Rogers-O'Brien in the Underlying Suit, with such duty to defend retroactive to the date of first tender to Cincinnati by or on behalf of Rogers-O'Brien;

2.    Declaring that Cincinnati's duty to defend Rogers-O'Brien in the Underlying Suit is primary and non-contributory and, therefore, that Liberty has no primary duty to defend or pay defense costs on behalf of Rogers-O'Brien;

3.    Declaring that Cincinnati breached the terms of the Cincinnati Policy by failing to defend Rogers-O'Brien in the Underlying Suit;

4.    Awarding Liberty its costs and attorneys' fees incurred in the defense of Rogers-O'Brien in the Underlying Suit;

5.    Awarding Liberty its costs and attorneys' fees incurred in bringing this action; and

6.    Awarding Liberty such other and further relief to which it may be entitled.

Respectfully submitted,

**HANNA & PLAUT, L.L.P.**
211 East Seventh Street, Suite 600
Austin, Texas 78701
Telephone:  (512) 472-7700
Facsimile:  (512) 472-0205

By:___*/s/ Catherine L. Hanna*_____
      Catherine L. Hanna
      State Bar No. 08918280
      Email:  channa@hannaplaut.com

**ATTORNEYS FOR PLAINTIFF
LM INSURANCE CORPORATION**

# EXHIBIT A

# THE CINCINNATI INSURANCE COMPANY

### A Stock Insurance Company

## COMMERCIAL GENERAL LIABILITY COVERAGE
## PART DECLARATIONS

Attached to and forming part of POLICY NUMBER: EPP 015 49 26

Named Insured is the same as it appears in the Common Policy Declarations

**LIMITS OF INSURANCE**

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $1,000,000 | |
| GENERAL AGGREGATE LIMIT | $2,000,000 | |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $2,000,000 | |
| PERSONAL & ADVERTISING INJURY LIMIT | $1,000,000 | ANY ONE PERSON OR ORGANIZATION |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | | ANY ONE |
| $100,000 limit unless otherwise indicated herein: | $ SEE GA233 | PREMISES |
| MEDICAL EXPENSE LIMIT | | |
| $5,000 limit unless otherwise indicated herein: | $ SEE GA233 | ANY ONE PERSON |

| CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|
| | | A - Area<br>B - Payroll<br>C - Gross Sales<br>D - Units<br>E - Other | Products / Completed Operations | All Other | Products / Completed Operations | All Other |
| METAL WORKS - SHOP (TX) | 56915 | C 1,274,586 | | | | |
| METAL WORKS - SHOP (TX) | 56916 | C 7,222,653 | | | | |
| CONTRACTORS - SUBCONTRACTED WORK (TX) | 91585 | E 2,742,176<br>TOTAL COST | | | | |
| AUTOMATIC ADD. INSURED - CONTRACTORS OPERATIONS | 29970 | | | | | |
| CONTRACTORS BROADENED COVERAGE | 29975 | | | | | |

The General Liability Coverage Part is subject to an annual minimum premium.

TOTAL ANNUAL PREMIUM

**FORMS AND / OR ENDORSEMENTS APPLICABLE TO COMMERCIAL GENERAL LIABILITY COVERAGE PART:**

| | | |
|---|---|---|
| GA101TX | 09/10 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG0103 | 06/06 | TEXAS CHANGES |
| CG0300 | 01/96 | DEDUCTIBLE LIABILITY INSURANCE |
| GA233 | 02/07 | CONTRACTORS' COMMERCIAL GENERAL LIABILITY BROADENED ENDORSEMENT |
| GA3024 | 05/14 | EXCLUSION - ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION |
| GA323 | 10/01 | EXCLUSION - LEAD LIABILITY |
| GA340 | 10/01 | EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY |

RED STEEL 000001

**FORMS AND / OR ENDORSEMENTS APPLICABLE TO COMMERCIAL GENERAL LIABILITY COVERAGE PART:**

| | | |
|---|---|---|
| GA369 | 11/02 | EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS ("EIFS") AND DIRECT-APPLIED EXTERIOR FINISH SYSTEMS ("DEFS") - BROAD FORM |
| GA382 | 03/02 | FUNGI OR BACTERIA EXCLUSION |

GA 532 07 08                     EPP 015 49 26                     **Page 2 of 2**

RED STEEL 000002

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS**.

## SECTION I - COVERAGES

## COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY;** or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS.**

      No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.**

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per Paragraph **1.d.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

   c. "Bodily injury" or "property damage" which:

      (1) Occurs during the "coverage term"; and

      (2) Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have occurred;

      includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

   d. You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

      (3) First observes, or first observed, the "bodily injury" or "property damage";

      (4) Becomes aware, or become aware, by any means other than as described in **(3)** above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

      (5) Becomes aware, or become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000003

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" which results from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. When a claim for such "bodily injury" or "property damage" is made, we will defend that claim provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured sustained in the "workplace";

**(2)** An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or

**(3)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraphs **(1)** or **(2)** above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollutant**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, Paragraph **(a)** does not apply to:

**1)** "Bodily injury" to any person injured while on any premises, site or location owned or occupied by, or rented or loaned to, you provided:

**a)** The injury is caused by the inadequate ventilation of vapors;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000004

**b)** The person injured is first exposed to such vapors during the policy period; and

**c)** Within 30 days of such first exposure, the person injured is clinically diagnosed or treated by a physician for the medical condition caused by the exposure to such vapors. However, Paragraph **c)** does not apply if the "bodily injury" is caused by vapors produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

This exception **1)** shall apply only to Named Insureds; we shall have no duty to defend or pay damages for any person or organization that is not a Named Insured. However, this paragraph does not apply if the "bodily injury" is caused by vapors produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

For the purpose of the exception granted in Paragraph **1)** only, vapors means any gaseous or airborne irritant or airborne contaminant, including smoke, fumes, vapor or soot, but excluding asbestos, which is discharged, dispersed, emitted, released or escapes from materials, machinery or equipment used in the service or maintenance of the premises. Vapors does not mean any gaseous or airborne irritants or contaminants used in a manufacturing process or which is the product or by-product

of any manufacturing process;

**2)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to this Coverage Part as an additional insured with respect to your ongoing operations or "your work" performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**3)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**1)** Any insured; or

**2)** Any person or organization for whom you may be legally responsible;

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, Paragraph **(d)** does not apply to:

**1)** "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release, escape or emission of fuels, lubricants or other operating fluids, or exhaust gases, which are needed to per-

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000005

form, or are the result of, the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids, or exhaust gases, escape, seep or migrate, or are discharged, dispersed, released or emitted from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids, or exhaust gases, escape, seep or migrate, or are discharged, dispersed, released or emitted with the intent to cause "bodily injury" or "property damage" or with the knowledge that "bodily injury" or "property damage" is substantially certain to occur, or if such fuels, lubricants or other operating fluids, or exhaust gases, are brought on or to the premises, site or location with such intent to escape, seep or migrate, or be discharged, dispersed, released or emitted as part of the operations being performed by such insured, contractor or subcontractor;

2) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

3) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any

way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, Paragraphs **(2)(a)** and **(b)** do not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. **Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 51 feet long; and

(b) Not being used to carry persons or property for a charge;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

    **(a)** The operation of machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

    **(b)** The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage to Property**

"Property damage" to:

**(1)** Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of an insured;

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire or explosion) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days, for which the amount we will pay is limited to the Damage To Premises Rented To You Limit as described in **SECTION III - LIMITS OF INSURANCE**.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000007

**l.    Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m.   Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)**   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)**   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.    Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)**   "Your product";

**(2)**   "Your work"; or

**(3)**   "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o.    Personal and Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p.    Asbestos**

"Bodily injury" or "property damage" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q.    Employment-Related Practices**

"Bodily injury" to:

**(1)**   A person arising out of any:

**(a)**   Refusal to employ that person;

**(b)**   Termination of that person's employment; or

**(c)**   Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)**   The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)**   Whether the insured may be liable as an employer or in any other capacity; and

**(2)**   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r.    Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

---

GA 101 TX 09 10

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Page 6 of 22

RED STEEL 000008

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

**(3)** First observes, or first observed, the "bodily injury" or "property damage";

**(4)** Becomes aware, or become aware, by any means other than as described in **(3)** above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

**(5)** Becomes aware, or become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

**s.** **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

**t.** **Distribution of Material in Violation of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **q.** do not apply to "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner, for which the amount we will pay is limited to the Damage to Premises Rented To You Limit as described in **SECTION III - LIMITS OF INSURANCE**.

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.** **Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY;** or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS**.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**.

**b.** This insurance applies to "personal and advertising injury" only if:

**(1)** The "personal and advertising injury" is caused by an offense arising out of your business; and

**(2)** The "personal and advertising injury" offense was committed in the "coverage territory" during the policy period; and

**(3)** Prior to the "coverage term" in which the "personal and advertising injury" offense is committed, you did not know, per Paragraph **1.d.** below, that the offense had been committed or had begun to be committed, in whole or in part.

**c.** "Personal and advertising injury" caused by an offense which:

**(1)** Was committed during the "coverage term"; and

**(2)** Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have been committed;

includes any continuation, change or resumption of that offense after the end of

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000009

the "coverage term" in which it first be-
came known by you.

**d.** You will be deemed to know that a "per-
sonal and advertising injury" offense has
been committed at the earliest time when
any "authorized representative":

**(1)** Reports all, or any part, of the "per-
sonal and advertising injury" to us or
any other insurer;

**(2)** Receives a written or verbal demand
or claim for damages because of the
"personal and advertising injury";

**(3)** First observes, or first observed, the
offense that caused the "personal
and advertising injury";

**(4)** Becomes aware, or become aware,
by any means, other than as de-
scribed in **(3)** above, that the offense
had been committed or had begun to
be committed; or

**(5)** Becomes aware, or become aware,
of a condition from which "personal
and advertising injury" is substan-
tially certain to occur.

**2.   Exclusions**

This insurance does not apply to:

**a.   Knowing Violation of Rights of Another**

"Personal and advertising injury" caused
by or at the direction of the insured with
the knowledge that the act would violate
the rights of another and would inflict
"personal and advertising injury".

**b.   Material Published With Knowledge of
Falsity**

"Personal and advertising injury" arising
out of oral or written publication of mate-
rial, if done by or at the direction of the in-
sured with knowledge of its falsity.

**c.   Material Published Prior to Coverage
Term**

"Personal and advertising injury" arising
out of oral or written publication of mate-
rial whose first publication took place be-
fore the later of the following:

**(1)** The inception of this Coverage Part;
or

**(2)** The "coverage term" in which insur-
ance coverage is sought.

**d.   Criminal Acts**

"Personal and advertising injury" arising
out of a criminal act committed by or at
the direction of the insured.

**e.   Contractual Liability**

"Personal and advertising injury" for
which the insured is obligated to pay
damages by reason of the assumption of
liability in a contract or agreement. This
exclusion does not apply to liability for
damages:

**(1)** That the insured would have in the
absence of the contract or agree-
ment; or

**(2)** Assumed in a contract or agreement
that is an "insured contract", pro-
vided the "personal and advertising
injury" is caused by or arises out of
an offense committed subsequent to
the execution of the contract or
agreement. When a claim for such
"personal and advertising injury" is
made, we will defend that claim, pro-
vided the insured has assumed the
obligation to defend such claim in the
"insured contract". Such defense
payments will not reduce the limits of
insurance.

**f.   Breach of Contract**

"Personal and advertising injury" arising
out of a breach of contract, except an im-
plied contract to use another's advertising
idea in your "advertisement".

**g.   Quality or Performance of Goods -
Failure to Conform to Statements**

"Personal and advertising injury" arising
out of the failure of goods, products or
services to conform with any statement of
quality or performance made in your "ad-
vertisement".

**h.   Wrong Description of Prices**

"Personal and advertising injury" arising
out of the wrong description of the price
of goods, products or services stated in
your "advertisement".

**i.   Infringement of Copyright, Patent,
Trademark or Trade Secret**

"Personal and advertising injury" arising
out of the infringement of copyright, pat-
ent, trademark, trade secret or other in-
tellectual property rights.

However, this exclusion does not apply to
infringement, in your "advertisement", of
copyright, trade dress or slogan.

**j.   Insureds in Media and Internet Type
Businesses**

"Personal and advertising injury" com-
mitted by an insured whose business is:

**GA 101 TX 09 10**              Includes copyrighted material of Insurance
Services Office, Inc., with its permission.              **Page 8 of 22**

RED STEEL 000010

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17. a., b.** and **c.** of "personal and advertising injury" under **SECTION V - DEFINITIONS**.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet is not, by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k.    Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board any insured hosts, owns, or over which any insured exercises control.

**l.    Unauthorized Use of Another's Name or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m.    Employment Related Practices**

"Personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**n.    Pollutant**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" at any time.

**o.    Pollutant-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**p.    Asbestos**

"Personal and advertising injury" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q.    Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that a "personal and advertising injury" offense had been committed or had begun to be committed, in whole or in part, prior to the "coverage term" in which such offense was committed or began to be committed.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that a "personal and advertising injury" offense has been committed or has begun to be committed at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to

**GA 101 TX 09 10**     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     **Page 9 of 22**

RED STEEL 000011

manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

**(1)** Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "personal and advertising injury";

**(3)** First observes, or first observed, the offense that caused the "personal and advertising injury";

**(4)** Becomes aware, or become aware, by any means other than as described in **(3)** above, that the "personal and advertising injury" offense had been committed or had begun to be committed; or

**(5)** Becomes aware, or become aware, of a condition from which "personal and advertising injury" is substantially certain to occur.

**r.  War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**s.  Distribution of Material in Violation of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM

Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## COVERAGE C. MEDICAL PAYMENTS

**1.  Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(1)** The accident takes place in the "coverage territory" and during the policy period;

**(2)** The expenses are incurred and reported to us within three years of the date of the accident; and

**(3)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2.  Exclusions**

We will not pay expenses for "bodily injury":

**a.  Any Insured**

To any insured, except "volunteer workers".

**b.  Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c.  Injury on Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

RED STEEL 000012

**d. Workers' Compensation and Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletic Activities**

To any person injured while officiating, coaching, practicing for, instructing or participating in any physical exercises or games, sports, or athletic contests or exhibitions of an athletic or sports nature.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

5. All costs taxed against the insured in the "suit".

6. Prejudgment interest awarded against the insured on that part of the judgment we become obligated to pay and which falls within the applicable limit of insurance. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or de-

posited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   **(1)** "Bodily injury" or "personal and advertising injury":

   **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the

GA 101 TX 09 10     Includes copyrighted material of Insurance Services Office, Inc., with its permission.     Page 11 of 22

RED STEEL 000013

conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by; or

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by,

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Insurance under this provision is afforded only until the 90th day after you acquire

or form the organization or the end of the policy period, whichever is earlier;

**b.** **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** **a.** The General Aggregate Limit is the most we will pay for the sum of:

**(1)** Medical expenses under **COVERAGE C. MEDICAL PAYMENTS;**

**(2)** Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**(3)** Damages under **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY.**

This General Aggregate Limit will not apply if either the Location General Aggregate Limit of Insurance, Paragraph **2.b.,** or the Construction Project General Aggregate Limit of Insurance, Paragraph **2.c.** applies.

**b.** A separate Location General Aggregate Limit of Insurance, equal to the amount of the General Aggregate Limit shown in the Declarations, shall apply to each location owned by, or rented or leased to you and is the most we will pay for the sum of:

**(1)** Damages under **COVERAGE A. BODILY INJURY AND PROPERTY**

**GA 101 TX 09 10**

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**Page 12 of 22**

RED STEEL 000014

**DAMAGE LIABILITY**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**(2)** Medical expenses under **COVERAGE C. MEDICAL PAYMENTS,**

which can be attributed to operations at only a single location owned by, or rented or leased to you.

**c.** A separate Construction Project General Aggregate Limit of Insurance, equal to the amount of the General Aggregate Limit shown in the Declarations, shall apply to each construction project and is the most we will pay for the sum of:

**(1)** Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

**(2)** Medical expenses under **COVERAGE C. MEDICAL PAYMENTS;**

which can be attributed only to ongoing operations and only at a single construction project.

**d.** Only for the purpose of determining which General Aggregate Limit of Insurance, **2.a., 2.b.,** or **2.c.,** applies:

**(1)** Location means premises involving the same or connecting lots, or premises, whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**(2)** Construction project means a location you do not own, rent or lease where ongoing improvements, alterations, installation, demolition or maintenance work is performed by you or on your behalf. All connected ongoing improvements, alterations, installation, demolition or maintenance work performed by you or on your behalf at the same location for the same persons or organizations, no matter how often or under how many different contracts, will be deemed to be a single construction project.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "bodily injury" and "property dam-

age" included in the "products-completed operations hazard".

**4.** Subject to **2.a.** above, the Personal and Advertising Injury Limit is the most we will pay under **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to **2. or 3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**; and

**b.** Medical expenses under **COVERAGE C. MEDICAL PAYMENTS**;

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Damage to Premises Rented to You Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire or explosion, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to **5.** above, the Medical Expense Limit is the most we will pay under **COVERAGE C. MEDICAL PAYMENTS** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

**1. Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

**2. Duties in the Event of Occurrence, Offense, Claim or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or a "personal and advertising injury" offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3.   Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.   Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part as of the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**5.   Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** of this Coverage Part, our obligations are limited as follows:

**a.   Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.   Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar insurance for "your work";

**(b)** That is Fire or Explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(d)** If the loss arises out of the maintenance or use of aircraft,

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

"autos" or watercraft to the extent not subject to **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, g. Aircraft, Auto or Watercraft**.

**(2)** Any other primary insurance available to the insured covering liability for damages arising out of the premises or operations, or the products and completed operations, for which the insured has been added as an additional insured by attachment of an endorsement.

**(3)** Any other insurance:

**(a)** Whether primary, excess, contingent or on any other basis, except when such insurance is written specifically to be excess over this insurance; and

**(b)** That is a consolidated (wrap-up) insurance program which has been provided by the prime contractor/project manager or owner of the consolidated project in which you are involved.

When this insurance is excess, we will have no duty under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.** **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**6.** **Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If:

**(1)** The earned premium is less than the deposit premium, we will return the excess to the first Named Insured; or

**(2)** The earned premium is greater than the deposit premium, the difference will be due and payable to us by the first Named Insured upon notice from us.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**7.** **Representations**

By accepting this Coverage Part, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this Coverage Part in reliance upon your representations.

**8.** **Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000017

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Part and any other Coverage Form or Coverage Part forming a part of this policy apply to the same "occurrence" or "personal and advertising injury" offense, the aggregate maximum Limit of Insurance under all the Coverage Forms or Coverage Parts shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or Coverage Part. This condition does not apply to any Coverage Form or Coverage Part issued by us specifically to apply as excess insurance over this Coverage Part.

**11. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V - DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. "Advertisement" includes a publicity article. For purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

**2.** "Authorized representative" means:

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are "authorized representatives".

**(2)** A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

**(3)** A limited liability company, your members and your managers are "authorized representatives".

**(4)** An organization other than a partnership, joint venture or limited liability company, your "executive officers" and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also "authorized representatives".

**(5)** A trust, your trustees are "authorized representatives".

**b.** Your "employees":

**(1)** Assigned to manage your insurance program; or

**(2)** Responsible for giving or receiving notice of an "occurrence", "personal and advertising injury" offense, claim or "suit";

are also "authorized representatives".

**3.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**4.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**5.** "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

**a.** The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000018

terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

   **(1)** The day the policy period shown in the Declarations ends; or

   **(2)** The day the policy to which this Coverage Part is attached is terminated or cancelled.

**b.** However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

**6.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

   **(1)** Goods or products made or sold by you in the territory described in **a.** above;

   **(2)** The activities of a person whose home is in the territory described in **a.** above, but is away for a short time on your business; or

   **(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication,

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in **a.** above or in a settlement to which we agree.

**7.** "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**8.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**9.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**10.** "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**11.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**12.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** An elevator maintenance agreement;

**f.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000019

**(1)** That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    **(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    **(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities;

**(4)** That indemnifies an advertising, public relations or media consulting firm for "personal and advertising injury" arising out of the planning, execution or failure to execute marketing communications programs. Marketing communications programs include but are not limited to comprehensive marketing campaigns; consumer, trade and corporate advertising for all media; media planning, buying, monitoring and analysis; direct mail; promotion; sales materials; design; presentations; point-of-sale materials; market research; public relations and new product development;

**(5)** Under which the insured, if an advertising, public relations or media consulting firm, assumes liability for "personal and advertising injury" arising out of the insured's rendering or failure to render professional services, including those services listed in Paragraph **(4)**, above;

**(6)** That indemnifies a web-site designer or content provider, or Internet search, access, content or service provider for injury or damage arising out of the planning, execution or fail-

ure to execute Internet services. Internet services include but are not limited to design, production, distribution, maintenance and administration of web-sites and web-banners; hosting web-sites; registering domain names; registering with search engines; marketing analysis; and providing access to the Internet or other similar networks; or

    **(7)** Under which the insured, if a web-site designer or content provider, or Internet search, access, content or service provider, assumes liability for injury or damage arising out of the insured's rendering or failure to render Internet services, including those listed in Paragraph **(6)**, above.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing firm. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

    **a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    **b.** While it is in or on an aircraft, watercraft or "auto"; or

    **c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**15.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **b.** Vehicles maintained for use solely on or next to premises you own or rent;

    **c.** Vehicles that travel on crawler treads;

    **d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        **(1)** Power cranes, shovels, loaders, diggers or drills; or

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000020

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**(1)** Equipment designed primarily for:

**(a)** Snow removal;

**(b)** Road maintenance, but not construction or resurfacing; or

**(c)** Street cleaning;

**(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

**(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**18.** "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**19.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed; or

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

**(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise

GA 101 TX 09 10    Includes copyrighted material of Insurance Services Office, Inc., with its permission.    Page 19 of 22

RED STEEL 000021

complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a schedule, states that products-completed operations are included.

**20.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

**21.** "Suit" means a civil proceeding in which money damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

**c.** An appeal of a civil proceeding.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you,

and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**24.** "Workplace" means that place and during such hours to which the "employee" sustaining "bodily injury" was assigned by you, or any other person or entity acting on your behalf, to work on the date of "occurrence".

**25.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**26.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# NUCLEAR ENERGY LIABILITY EXCLUSION
## (Broad Form)

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an insured under this Coverage Part is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the insured is, or had this Coverage Part not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf of, an insured, or **(b)** has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this exclusion:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

   "Waste" means any waste material **(a)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(b)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

   "Nuclear facility" means:

   A. Any "nuclear reactor";

   B. Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing "spent fuel", or **(3)** handling, processing or packaging "waste";

   C. Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000023

**D.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# EXHIBIT B

FILED
8/19/2019 2:09 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

CAUSE NO. CC-19-00837-c

| | | |
|---|---|---|
| ESTEBAN S. ALVAREZ, | § | IN THE COUNTY COURT |
| | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | |
| | § | |
| VENTURE COMMERCIAL MANAGEMENT, | § | AT LAW NO. 3 |
| LLC, | § | |
| | § | |
| DEFENDANT/THIRD PARTY | § | |
| PLAINTIFF | § | |
| | § | |
| VS. | § | |
| | § | |
| UNITED PROTECTIVE SERVICES OF | § | |
| HOUSTON, INC. AND ROGERS-O'BRIEN | § | |
| CONSTRUCTION, | § | |
| | § | |
| THIRD PARTY DEFENDANTS | § | |
| | § | |
| AND | § | |
| | § | |
| ROGERS-O'BRIEN CONSTRUCTION | § | |
| COMPANY, LTD, | § | |
| | § | |
| DEFENDANT | § | |
| | § | |
| VS. | § | |
| | § | |
| RED STEEL COMPANY, FAB-HAR | § | |
| CORPORATION AND COMPASS | § | |
| STEEL ERECTION, INC. | § | |
| | § | |
| DEFENDANTS | § | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' SECOND AMENDED PETITION
## AND REQUESTS FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff ESTEBAN S. ALVAREZ, and files this Second Amended Plaintiff's Petition and Requests for Disclosure, and for cause of action would show the Court as follows:

**1.     DISCOVERY CONTROL PLAN**

1.01    Plaintiff intends for this lawsuit to be controlled by Discovery Control Plan, Level 3, Texas Rule of Civil Procedure 190.3.

**2.     PLAINTIFF'S REQUEST FOR DISCLOSURE**

2.01    Defendants/Third Party Defendants, hereinafter referred to as Defendants, ROGERS-O'BRIEN, RED STEEL, FAB-HAR and COMPASS are  hereby requested to disclose, within fifty (50) days of service of this amended petition and incorporated request, the information or material described in Rule 194.2(a)-(I) of the Texas Rules of Civil Procedure, to the undersigned counsel of record for Plaintiff.

**3.     PARTIES**

3.01    Plaintiff ESTEBAN S. ALVAREZ is an individual who resides in Garland, Dallas County, Texas.  Plaintiff's last three digits of his Texas driver's license are 363 and the last three digits of his Social Security number are 284.

3.02    Defendant/Third Party Plaintiff VENTURE COMMERCIAL MANAGEMENT, LLC, (hereinafter VENTURE) is a Texas corporation located in Dallas County, Texas, and has been served with process and has answered and appeared herein.

3.03    Third Party Defendant UNITED PROTECTIVE SERVICES OF HOUSTON, INC., (hereinafter UNITED) is a Domestic for-profit corporation doing business at 6500 Greenville Ave.,

Suite 525, Dallas, Texas 75206, and may be served through its registered agent, Edward L. Allen, at that same address.

3.04    Third Party Defendant ROGERS-O'BRIEN CONSTRUCTION COMPANY, LTD a/k/a ROCC, INC., (hereinafter ROGERS) is a Domestic for-profit corporation doing business at 1901 Regal Row, Dallas, Texas 75235, and through agreement may be served by serving its attorney of record, Robert J. Palmer, Two Lincoln Centre, 5420 LBJ Frwy., Ste. 1200, Dallas, Texas 75240.

3.05    Third Party Defendant RED STEEL COMPANY, (hereinafter RED STEEL) is a Texas corporation, with its principal place of business in Dallas, Dallas County, Texas, and through agreement may be served by serving its attorney of record, Randy Nelson, Thompson, Coe, 700 N. Pearl St., 25th Floor, Dallas, Texas 75201.

3.06    Third Party Defendant FAB-HAR CORPORATION, (hereinafter FAB-HAR) is a Texas corporation, with its principal place of business in Princeton, Texas, and can be served through its registered agent, James Hargis, 3030 Preston Hills Circle, Prosper, Texas 75078.

3.07    Third Party Defendant COMPASS STEEL ERECTION, INC., (hereinafter COMPASS) is a Texas Corporation, with its principal place of business in Denton, Denton County, Texas, and may be served with process by serving its registered agent, Marvin Durham, 6432 Fishtrap Rd., Denton, Texas 76208.

3.08    All Defendants/Third Party Defendants are being sued under their common or assumed names as per Texas Rules of Civil Procedure, Rule 28.  In the event any parties are misnamed or are not included herein, it is the Plaintiff's contention that such was a "misidentification," "misnomer," and/or such parties are/were "alter egos" of parties named herein.  Alternatively, Plaintiff contends that such "corporate veils" should be pierced to hold such parties properly included in the interest

PLAINTIFF'S SECOND AMENDED PETITION AND REQUESTS FOR DISCLOSURE        PAGE 3

of justice.

3.09    At the time of the incident made the basis of this lawsuit, Defendants VENTURE, ROGERS, RED STEEL, FAB-HAR and COMPASS, owned, installed, maintained, designed, manufactured and/or managed the dumpster gate which failed and injured Plaintiff located at 8383 Preston Road, Dallas, Texas 75225, commonly known as THE PLAZA AT PRESTON CENTER.

4.    **VENUE AND JURISDICTION**

4.01    Venue is proper in Dallas County, Texas, pursuant to § 15.002 et. seq. of the Texas Civil Practices & Remedies Code in that Dallas County is the county where the incident in question occurred.  Furthermore, this Court has jurisdiction over this lawsuit as the amounts sought herein are within the jurisdictional limits of this Court.  While the amount of damages to be awarded will be a decision made by a jury of Plaintiff's peers, to comply with T.R.C.P. 47, as revised, Plaintiff states he is seeking damages pursuant to Rule 47(c)(4).

5.    **BACKGROUND FACTS**

5.01    On the morning of January 23, 2019, Plaintiff ESTEBAN S. ALVAREZ was working as a security guard for the premises.  Plaintiff was employed by United Protective Services.  During a routine perimeter check of  the property, Plaintiff was closing a opened dumpster gate behind True Food Kitchen.  As Plaintiff was closing the gate, it broke free from the hinges and crushed Plaintiff. Plaintiff suffered severe injuries.

6.    **CAUSES OF ACTION AGAINST DEFENDANT VENTURE COMMERCIAL**

6.01    At the time of the incident in question, Defendant VENTURE was guilty of various acts and omissions, each of which, singularly or in combination, constituted negligence and each of said acts and omissions of negligence was a proximate cause of the incident in question and injuries and

damages to Plaintiff. Defendant VENTURE's acts and omissions of negligence include, but are not limited to the following:

1.  Failure to exercise ordinary care;
2.  Failure to do that which a reasonable and prudent property manager would have done under the same or similar circumstances;
3.  Failure to properly maintain the gate in question;
4.  Failure to properly inspect and insure the gate in question was safe for use;
5.  Failure to properly supervise personnel, employees, agents, contractors, or servants, who maintained the dumpster gates at THE PLAZA AT PRESTON CENTER to insure that the dumpster gate maintenance and inspections were done in an adequate manner;
6.  Failure to properly train personnel, employees, agents, contractors, and servants who maintained the dumpster gates at THE PLAZA AT PRESTON CENTER to insure that the gates and their hinges were maintained in an adequate manner;
7.  Failure to have policies and procedures in place in regard to the dumpster gates that would prevent unreasonable risks of harm to foreseeable personnel on their business premises;
8.  Failure to develop and implement adequate procedures and mechanisms for monitoring and evaluating the dumpster gates of the premises in order to minimize or avoid risks posed by the gates and to avoid such omissions thereby threatening the safety and welfare of personnel on said premises;
9.  Defendant knew or should have known that improperly maintained or installed dumpster gates present an unreasonable risk of harm to Plaintiff;
10. Plaintiff was not aware nor could he be aware of this risk before he encountered it;
11. Defendant failed to take reasonable steps to discover and correct the dangerous condition and failed to warn Plaintiff of the existence of this danger; and
12. Defendant VENTURE had a duty to make its premises safe because (1) it was necessary for Plaintiff at the direction of Defendant VENTURE to encounter the condition as part of his job duties assigned to him by Defendant VENTURE and (2) Defendant VENTURE should have anticipated that Plaintiff was unable to avoid the risks associated with a defective, improperly installed, maintained or dangerous dumpster gate.

6.02    Each of the foregoing acts or omissions, singularly or in combination with others, constituted negligence and gross negligence, which proximately caused the above referenced occurrence and Plaintiff's injuries and damages. Defendant is liable for such negligence and gross negligence.

7.    **CAUSES OF ACTION AGAINST THIRD PARTY DEFENDANT UNITED**

7.01    Plaintiff does not assert any cause of action against Third Party Defendant United Protective. Defendant VENTURE seeks indemnification from Third Party Defendant United. This claim is irrelevant to Plaintiff's claims and should be severed or dismissed from this case.

8.    **CAUSES OF ACTION AGAINST THIRD PARTY DEFENDANT ROGERS-O'BRIEN**

8.01    Defendant Rogers was the general contractor in charge of the construction site at the Plaza at Preston Center which included the installation of the dumpster gate which failed and severely injured Plaintiff. Plaintiff would show that Defendant Rogers is liable to Plaintiff for all or part of Plaintiff's claims for negligence and premises liability against Plaintiff because Defendant was negligent in one or more of the following ways:

1.    In failing to do that which a reasonable and prudent general contractor would have done under the same or similar circumstances;
2.    in failing to exercise ordinary care;
3.    in failing to follow the architects and engineers specifications for the correct type of dumpster gate to use on the premises;
4.    in failing to property specify the safe type of dumpster gate to use on the premises;
5.    in failing to install a safe dumpster gate on the premises;
6.    in creating a dangerous and hazardous condition by installing a dumpster gate that was not structurally strong enough to withstand normal wear and tear;
7.    Defendant knew or should reasonable have known that improperly ordering and utilizing a two hinged metal dumpster gate instead of a three hinged metal dumpster gate, as specified, presented an unreasonable risk of harm to third parties;
8.    Plaintiff was not aware nor could have been aware of this risk;
9.    Defendant failed to take reasonable steps to discover and correct the dangerous condition and failed to warn Plaintiff of the existence of the danger;
10.    in failing to follow proper plans, specifications, city ordinances and building codes in the manufacturer and installation of the dumpster gates; and
11.    In failing to hire competent subcontractors to perform work related to the dumpster gates which injured Plaintiff.

8.02    Each of the foregoing acts or omissions, singularly or in combination with others, constituted negligence and gross negligence, which proximately caused the above referenced occurrence and the Plaintiff's injuries and damages.  Defendant Rogers is liable for such negligence and gross negligence.

9.    **CAUSES OF ACTION AGAINST THIRD PARTY DEFENDANTS FAB-HAR, RED STEEL AND COMPASS**

9.01    Defendant Rogers, as the general contractor in control of the installation of the dumpster gate, contracted with Fab-Har, Red Steel and Compass to perform work related to the dumpster gates at issue in this lawsuit.  Specifically, Fab-Har was to provide all labor, materials and equipment necessary to complete the dumpster gates in accordance with all plans, specifications, city ordinances and code.

9.02    At the instruction of Defendant Rogers, Defendants Fab-Har, Red Steel and Compass provided labor materials and equipment to manufacture and install the dumpster gates which failed and injured Plaintiff.

9.03    Plaintiff would show that Defendants Fab-Har, Red Steel and Compass are liable for all or part of Plaintiff's claims for negligence and premises liability against Plaintiff because Defendants Fab-Har, Red Steel and Compass were negligent in one or more of the following ways:

1.    In failing to do that which a reasonable and prudent subcontractor would have done under the same or similar circumstances;
2.    in failing to exercise ordinary care;
3.    in failing to follow the architects and engineers specifications for the correct type of dumpster gate to use on the premises;
4.    in failing to property specify the safe type of dumpster gate to use on the premises;
5.    in failing to install the safe type of dumpster gate on the premises;

6.  in creating a dangerous and hazardous condition by installing a dumpster gate that was not structurally strong enough to withstand normal wear and tear;

7.  Defendants knew or should have known that improperly ordering and utilizing a two hinged metal dumpster gate instead of a three hinged metal dumpster gate, as specified, presented an unreasonable risk of harm to third parties;

8.  Plaintiff was not aware nor could have been aware of this risk;

9.  Defendants failed to take reasonable steps to discover and correct the dangerous condition and failed to warn Plaintiff of the existence of the danger;

10. in failing to follow proper plans, specifications, city ordinances and building codes in the manufacturer and installation of the dumpster gates.

9.04    Each of the foregoing acts or omissions, singularly or in combination with others, constitutes negligence and gross negligence, which proximately caused the above referenced occurrence and the Plaintiff's alleged injuries and damages.  Defendants Fab-Har, Red Steel and Compass are liable for such negligence and gross negligence.

## 10.    DAMAGES

10.01   As a direct and proximate result of the negligence of Defendant, as alleged above, Plaintiff suffered serious and permanent bodily injuries, the extent of which are still unknown.  At the present time, Plaintiff seeks to recover the following damages:

a.  Reasonable and necessary medical, hospital and pharmaceutical care and expenses in the past;

b.  Reasonable and necessary medical, hospital and pharmaceutical care and expenses in the future;

c.  Physical pain and suffering in the past;

d.  Physical pain and suffering that in reasonable probability he will suffer in the future;

e.  Mental anguish suffered in the past;

f.  Mental anguish that in reasonable probability he will suffer in the future;

g.    Physical impairment which Plaintiff has suffered in the past;

h.    Physical impairment which Plaintiff, in reasonable probability, will suffer in the future;

i.    Physical disfigurement in the past;

j.    Physical disfigurement that in reasonable probability he will suffer in the future;

k.    Loss of earnings in the past; and

l.    Loss of earnings and earning capacity in the future.

10.02  Plaintiff seeks recovery for these damages as described above against Defendants VENTURE, ROGERS, FAB-HAR, RED STEEL and COMPASS.

11.03   The conduct of the Defendants herein, jointly and severally, constituted acts or omissions which, when viewed objectively from the standpoint of the actor at the time of its occurrence, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others and of which the Defendants had actual subjective awareness of said risk but nevertheless proceeded with conscious indifference to the rights, safety or welfare of the Plaintiff herein. Accordingly, the imposition of punitive damages against Defendants is sought and appropriate herein.

**11.    INTEREST**

11.01   Plaintiff seeks to recover both pre- and post-judgment interest at the highest rates allowed by law.

**12.    REQUEST FOR JURY TRIAL**

12.01   Pursuant to Rule 216, TEXAS RULES OF CIVIL PROCEDURE, Plaintiff hereby requests a trial

PLAINTIFF'S SECOND AMENDED PETITION AND REQUESTS FOR DISCLOSURE        PAGE 9

by jury.

## 14.    INTENT TO USE DISCOVERY DOCUMENTS

Plaintiff gives notice of intent to utilize items produced by all parties in discovery in any pre-trial proceeding or the trial of this cause, and the authenticity of such items is self-proven pursuant to Texas Rules of Civil Procedure 193.7.

## 14.    <u>PRAYER</u>

**14.01    WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that upon final trial, Plaintiff have judgment as follows:**

   a.    Judgment against Defendants/Third Party Defendants for actual damages in an amount within the jurisdictional limits of this Court;

   b.    Pre-judgment interest as provided by law;

   c.    Post-judgment interest as provided by law;

   d.    Punitive damages as heretofore pleaded;

   e.    Costs of court; and

   f.    Such other and further relief, at law or in equity, to which Plaintiff may show himself to be justly entitled.

Respectfully submitted,

**LAW OFFICES OF CARMEN S. MITCHELL**

**/s/ Carmen S. Mitchell**

**_____**

**CARMEN S. MITCHELL**
**State Bar No. 14206300**
**750 N. St. Paul, Suite 1800**
**Dallas, Texas 75201**
**214-651-8218**
**214-651-8506 (FAX)**
**Cmitchell@mitchellgoff.com**
**And**
**LAW OFFICE OF RON MCCALLUM**
**Ron McCallum**
**State Bar No. 24041424**
**750 N. St. Paul, Suite 1800**
**Dallas, Texas 75201**
**214-702-0555**
**214-594-9618 (FAX)**
**Info@mccallumfirm.com**
**And**
**MATTHEW J. KITA**
**State Bar No. 24050883**
**P.O. Box 5119**
**Dallas, Texas 75208**
**214-699-1863**
**Matt@mattkita.com**

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing document was delivered, via e-file, pursuant to the Texas Rules of Civil Procedure, to all counsel of record on this, the _____ day of August, 2019.

**/S/ Carmen S. Mitchell**

**_____**

**Carmen S. Mitchell**

PLAINTIFF'S SECOND AMENDED PETITION AND REQUESTS FOR DISCLOSURE          PAGE 11

# EXHIBIT C

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS**.

## SECTION I - COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY;** or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS.**

      No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per Paragraph **1.d.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

   c. "Bodily injury" or "property damage" which:

      (1) Occurs during the "coverage term"; and

      (2) Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have occurred;

      includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

   d. You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

      (3) First observes, or first observed, the "bodily injury" or "property damage";

      (4) Becomes aware, or become aware, by any means other than as described in **(3)** above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

      (5) Becomes aware, or become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

RED STEEL 000003

# EXHIBIT D

Received

NOV - 2 2011

# ROGERS·O'BRIEN CONSTRUCTION CO., LTD.

STANDARD SUBCONTRACT AGREEMENT

**Rogers-O'Brien**

| | |
|---|---|
| CONTRACTOR: | ROGERS-O'BRIEN CONSTRUCTION CO., LTD.<br>1901 REGAL ROW•DALLAS, TX 75235<br>(214) 962-3000 |

SUBCONTRACT NO: 11011 – 05 – 01S

EFFECTIVE DATE: 9/9/11    COST CODE: 05-10-100

CONTRACTOR'S JOB NO. 11011

IN CONSIDERATION OF THE MUTUAL COVENANTS CONTAINED HEREIN, THE PARTIES HERETO AGREE AS FOLLOWS:

**PROJECT**  Plaza at Preston Center (Tower & Garage)    SUPT: Chris Carrington

**LOCATION**  Plaza at Preston Center    PHONE: 214-962-3000

University Park, TX    FAX PHONE: 214-962-3001
Plaza at Preston Center (Tower & Garage)    SUPT: Chris Carrington

**SUBCONTRACTOR**  Red Steel Company    CONTACT: Lee Owen

10566 Spangler Road    PHONE: 972-243-4242

Dallas, TX 75220    FAX PHONE: 972-556-0324
(CALLED "SUBCONTRACTOR")

Subcontractor is a    CORPORATION    (Corporation, Partnership, Sole Proprietor). If a Corporation, Subcontractor is
Incorporated under the laws of the State of    TEXAS    . Subcontractors Federal Tax ID Number or Social Security Number Is
75-1391121

**OWNER**  Caruth/Preston Road Associates, Ltd.

8311 Preston Center Plaza Drive

Dallas, TX 75225
(CALLED 'OWNER')

**ARCHITECT**  Good Fulton & Farrell

2808 Fairmount, Suite 300

Dallas, TX 75201
(CALLED "ARCHITECT")

**PLANS & SPECIFICATIONS**  Exhibit E – Special Requirements
Exhibit X – Drawing Log
Exhibit Y – Specification Log
Exhibit Z - Schedule

(CALLED "PLANS AND SPECIFICATIONS")

1. **PRIME CONTRACT:** THE "PRIME CONTRACT" IS THE CONTRACT BETWEEN THE OWNER AND THE CONTRACTOR. THE CONSTRUCTION CALLED FOR IN THE PRIME CONTRACT IS CALLED THE "WORK". THE TERM "PRIME CONTRACT" INCLUDES THE PLANS, SPECIFICATIONS, GENERAL AND SPECIAL CONDITIONS, ADDENDA, AND ALL OTHER CONTRACT DOCUMENTS WHICH ARE INCORPORATED INTO THAT AGREEMENT BY ITS TERMS. EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT IS FAMILIAR WITH THE TERMS OF THE PRIME CONTRACT, AND AGREES THAT THE PRIME CONTRACT (INCLUDING THE CONTRACT DOCUMENTS INCORPORATED THEREIN) IS INCORPORATED HEREIN IN ITS ENTIRETY FOR ALL PURPOSES AS IF COPIED AT LENGTH AND ATTACHED HERETO. IN THE EVENT OF A DISCREPANCY BETWEEN THE PRIME CONTRACT AND THIS SUBCONTRACT, THIS SUBCONTRACT SHALL GOVERN.

2. **SCOPE OF WORK:** SUBCONTRACTOR AGREES TO PROVIDE AT HIS OWN COST AND EXPENSE ALL LABOR, MATERIALS, MACHINERY, TOOLS, SCAFFOLDING HOISTING FACILITIES, AND ANY OTHER ITEMS NECESSARY TO TIMELY AND FULLY COMPLETE THE SUBLET WORK (CALLED THE "SUBLET WORK") SET FORTH ON EXHIBIT "A" ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE, IN STRICT ACCORDANCE WITH THE PRIME CONTRACT.

3. **SUBCONTRACT AMOUNT:** IN CONSIDERATION OF THE FAITHFUL PERFORMANCE OF THE COVENANTS AND AGREEMENTS HEREIN, TO THE FULL SATISFACTION AND ACCEPTANCE OF OWNER AND/OR ARCHITECT AND CONTRACTOR, CONTRACTOR AGREES TO PAY, OR CAUSE TO BE PAID, SUBCONTRACTOR IN DALLAS COUNTY, TEXAS, THE SUM OF
Six Hundred Fifteen Thousand Dollars

DOLLARS  $ 615,000.00
AT THE TIMES AND IN THE MANNER CONSISTENT WITH ARTICLES 12 AND 13 OF THIS AGREEMENT.

4. **PERFORMANCE:** SUBCONTRACTOR AGREES TO PERFORM THE SUBLET WORK IN A CAREFUL AND WORKMANLIKE MANNER IN ACCORDANCE WITH THE BEST CONSTRUCTION PRACTICES AND WITH THIS SUBCONTRACT, AND IN STRICT ACCORDANCE WITH THE PRIME CONTRACT, AND TO ASSUME AND DISCHARGE ALL RESPONSIBILITIES WHICH CONTRACTOR HAS ASSUMED UNDER THE PRIME CONTRACT WITH RESPECT TO THE SUBLET WORK, EXCEPT AS OTHERWISE PROVIDED HEREIN, SUBCONTRACTOR AGREES TO PROCURE MATERIALS AND SUPPLIES IN ADVANCE AND TO PROVIDE SUFFICIENT MEN, EQUIPMENT AND SUPERVISION TO ENSURE THAT THE SUBLET WORK WILL BE PROSECUTED DILIGENTLY AND COORDINATED WITH OTHER WORK AT THE SITE AND COMPLETED WITHIN THE TIME ALLOTTED AND IN ACCORDANCE WITH THE REQUIREMENTS OF THE PRIME CONTRACT. SUBCONTRACTOR SHALL HAVE A SUPERVISOR AT ALL TIMES THAT HE HAS WORKERS ON THE JOBSITE. SUBCONTRACTOR SHALL BE RESPONSIBLE FOR ALL HANDLING OF HIS MATERIAL AT THE JOBSITE, INCLUDING, BUT NOT LIMITED TO, HOISTING, DELIVERIES, TRANSPORTATION, UNLOADING, STORING AND SAFEKEEPING. SUBCONTRACTOR HAS SATISFIED HIMSELF, BY HIS OWN INVESTIGATION AND RESEARCH, REGARDING ALL CONDITIONS AFFECTING THE WORK TO BE DONE AND MATERIALS TO BE FURNISHED, AND AS TO THE MEANING AND INTENTION OF THE PRIME CONTRACT.

5.  **APPROVAL AND PROGRESS DATA:** SUBCONTRACTOR SHALL CAREFULLY EXAMINE SPECIFICATION REQUIREMENTS FOR APPROVAL MATERIAL TO BE SUBMITTED SUCH AS SHOP DRAWINGS, DATA, SCHEDULES, SAMPLES, ETC. THEN HE SHALL SUBMIT SUCH MATERIAL AT HIS OWN EXPENSE AND IN SUCH FORM REQUIRED BY THE PRIME CONTRACT IN SUFFICIENT TIME TO PREVENT ANY DELAY IN THE DELIVERY OF SUCH MATERIALS AND THE INSTALLATION THEREOF. IF "IN-PLACE" OR "AS-BUILT" DRAWINGS ARE SPECIFIED TO BE PREPARED, THESE SHALL BE PREPARED AND SUBMITTED TO CONTRACTOR BEFORE FINAL PAYMENT IS REQUIRED. SUBCONTRACTOR SHALL COMPLETE AND SUBMIT TO CONTRACTOR ON A DAILY BASIS, DAILY PROGRESS REPORT FORMS WHICH WILL BE FURNISHED TO SUBCONTRACTOR BY CONTRACTOR.

6.  **COMMENCEMENT AND COMPLETION OF THE WORK:** TIME IS OF THE ESSENCE OF THIS SUBCONTRACT. SUBCONTRACTOR AGREES TO SUPPLY MATERIALS, LABOR AND EQUIPMENT AS NECESSARY TO COMMENCE HIS SUBLET WORK WHEN DIRECTED BY CONTRACTOR. HE SHALL DILIGENTLY PURSUE THE COMPLETION OF HIS SUBLET WORK, AND COORDINATE HIS SUBLET WORK WITH THAT BEING DONE ON THE PROJECT BY CONTRACTOR AND OTHER TRADES SO THAT HIS SUBLET WORK OR THE WORK OF OTHERS SHALL NOT BE DELAYED OR IMPAIRED BY ANY ACT OR OMISSION OF AN ACT BY SUBCONTRACTOR. CONTRACTOR SHALL HAVE THE RIGHT TO DECIDE THE TIME OR ORDER IN WHICH THE VARIOUS PORTIONS OF THE WORK SHALL BE UNDERTAKEN OR COMPLETED OR THE PRIORITY OF THE WORK OF OTHER SUBCONTRACTORS, AND, IN GENERAL, ALL MATTERS REPRESENTING THE TIMELY AND ORDERLY CONDUCT OF THE SUBLET WORK OF SUBCONTRACTOR ON THE PREMISES. CONTRACTOR MAY PREPARE A COORDINATED PROGRESS SCHEDULE, AND IF HE DOES SO, SUBCONTRACTOR SHALL BE REQUIRED TO PERFORM THE WORK IN ACCORDANCE WITH SUCH SCHEDULE AS IT MAY BE MODIFIED BY CONTRACTOR AS WORK PROGRESSES. ANY CPM SCHEDULES OR OTHER SCHEDULES GENERATED BY CONTRACTOR SHALL BECOME PART OF THIS SUBCONTRACT. SUBCONTRACTOR SHALL BE LIABLE FOR ANY LIQUIDATED DAMAGES WHICH MAY BECOME DUE TO THE OWNER UNDER THE GENERAL CONTRACT OR ANY EXTRA EXPENSES INCURRED BY THE GENERAL CONTRACTOR. SUCH AS OVERHEAD AND SUPERVISION, DUE TO SUBCONTRACTOR'S DELAYS.

7.  **CHANGES IN THE WORK:** SHOULD CONTRACTOR, AT ANY TIME DURING THE PROGRESS OF THE WORK, REQUEST ANY CHANGES IN THE SCOPE OF THE SUBLET WORK IN THIS SUBCONTRACT, HE SHALL HAVE THE RIGHT AND POWER TO MAKE SUCH REQUESTS AND SUBCONTRACTOR SHALL WITHIN A REASONABLE TIME THEREAFTER SUBMIT AN ITEMIZED ESTIMATE REFLECTING ANY COST CHANGES REQUIRED TO MAKE THE CHANGES, IT IS DISTINCTLY UNDERSTOOD AND AGREED, REGARDLESS FROM WHOM ORDERS MAY BE TAKEN FOR CHANGES IN THE SCOPE OF THE WORK, THAT NO SUCH CHANGES ARE TO BE MADE EXCEPT BY A SUBCONTRACT CHANGE ORDER ISSUED BY CONTRACTOR AND THEN ONLY WHEN SUCH ORDER SETS FORTH THE AMOUNT OF ANY ADDITION OR DEDUCTION AND IS SIGNED BY BOTH PARTIES THERETO. IF SUBCONTRACTOR INITIATES A SUBSTITUTION, DEVIATION OR CHANGE IN THE WORK WHICH AFFECTS THE SCOPE OF THE WORK OR THE SUBLET WORK OR CAUSES EXPENSE TO DEFECTIVE WORK, SUBCONTRACTOR SHALL BE LIABLE FOR THE EXPENSES THEREOF.

8.  **DEFECTIVE WORK, CLAIMS AND DISPUTES:**

8.1  PAYMENTS OTHERWISE DUE MAY BE WITHHELD BY CONTRACTOR ON ACCOUNT OF DEFECTIVE WORK NOT REMEDIED, CLAIMS FILED, EVIDENCE INDICATING PROBABILITY OF FILING OF CLAIMS, FAILURE OF SUBCONTRACTOR TO MAKE PAYMENTS PROPERLY TO ITS SUBCONTRACTORS OR FOR MATERIAL OR LABOR, OR A REASONABLE DOUBT THAT THE SUBCONTRACT CAN BE COMPLETED FOR THE BALANCE THEN UNPAID. IF SAID CAUSES ARE NOT REMOVED, WITHIN 48 HOURS AFTER WRITTEN NOTICE, CONTRACTOR MAY RECTIFY THE SAME AT SUBCONTRACTOR'S EXPENSE. CONTRACTOR MAY OFFSET AGAINST ANY SUMS DUE SUBCONTRACTOR HEREUNDER THE AMOUNT OF ANY LIQUIDATED OR UNLIQUIDATED OBLIGATION OF SUBCONTRACTOR TO CONTRACTOR, WHETHER OR NOT ARISING OUT OF THIS SUBCONTRACT. SUBCONTRACTOR AGREES TO BE BOUND BY ALL THE PROVISIONS OF THE PRIME CONTRACT, INCLUDING BUT NOT LIMITED TO PROVISIONS RELATING TO QUANTITIES, MEASUREMENT AND PAYMENT, TO CHANGE ORDERS, EXTRA WORK, VARIATIONS IN PLANS AND/OR SITE CONDITIONS, TIME EXTENSIONS AND CLAIMS. IF ANY PART OF THE SUBLET WORK DEPENDS UPON THE WORK OF CONTRACTOR OR OF ANY OTHER SUBCONTRACTOR, SUBCONTRACTOR SHALL INSPECT SUCH OTHER WORK AND PROMPTLY REPORT TO CONTRACTOR ANY DEFECTS OR INADEQUATE PERFORMANCE WHICH ADVERSELY AFFECTS SUBCONTRACTOR'S WORK. IF THERE APPEAR TO BE ANY VARIATIONS OR DISCREPANCIES OF DIMENSIONS, QUANTITIES, OR OTHER MATTERS SET FORTH IN THE PLANS, SPECIFICATIONS, AND OTHER PORTIONS OF THE PRIME CONTRACT, SUBCONTRACTOR WILL PROMPTLY BRING THE MATTER TO THE ATTENTION OF CONTRACTOR IN WRITING. SUBCONTRACTOR AGREES TO BE BOUND BY THE TERMS OF THE PRIME CONTRACT WITH RESPECT TO SUCH VARIATIONS. ALL CLAIMS WHICH SUBCONTRACTOR HAS OR WISHES TO ASSERT AGAINST CONTRACTOR MUST BE PRESENTED IN WRITING TO CONTRACTOR NOT LATER THAN 10 DAYS AFTER SUBCONTRACTOR IS AWARE OR SHOULD BE AWARE THAT A CLAIM WILL OR DOES EXIST, OR SUCH LONGER TIME AS MAY BE PROVIDED BY LAW, EVEN THOUGH THE EXACT NATURE OF THE CLAIM AND THE AMOUNT OF THE CLAIM MAY NOT BE DETERMINABLE AT THAT TIME. THE NATURE OF THE CLAIM AND THE AMOUNT OF THE CLAIM MUST BE PRESENTED TO CONTRACTOR IN WRITING AS SOON THEREAFTER AS SUBCONTRACTOR HAS OR SHOULD HAVE SUCH INFORMATION, AND SUBCONTRACTOR HEREBY WAIVES ALL CLAIMS NOT PRESENTED AS PROVIDED HEREIN.

ANY CLAIM FOR EXTRA COSTS INCURRED BY SUBCONTRACTOR ARISING FROM OR PERTAINING TO ANY CAUSE WHATSOEVER, INCLUDING WITHOUT LIMITATION CHANGED SITE CONDITIONS, ADMINISTRATION OF THE SUBCONTRACT, DELAYS, AND INTERFERENCE, MUST BE SUBMITTED IN WRITING TO CONTRACTOR WITHIN 21 DAYS AFTER THE OCCURRENCE OF THE EVENT GIVING RISE TO SUCH CLAIM OR WITHIN 21 DAYS AFTER SUBCONTRACTOR SHOULD HAVE RECOGNIZED THE CONDITION GIVING RISE TO THE CLAIM, WHICHEVER IS LATER. IT IS AGREED THAT ANY SUCH CLAIM BY SUBCONTRACTOR NOT SUBMITTED WITHIN THIS SPECIFIED TIME FRAME WILL NOT BE A CLAIM FOR WHICH SUBCONTRACTOR IS ENTITLED TO EXTRA COMPENSATION.

8.2  SHOULD ANY DISPUTE OR CONTROVERSY ARISE BETWEEN CONTRACTOR AND SUBCONTRACTOR CONCERNING ANY MATTER INVOLVING OR ARISING OUT OF THE SUBCONTRACT, THE FOLLOWING PROCEDURES SHALL APPLY:

(A)  IF THE CLAIM RESULTS FROM ACTION OR ACTS BY THE OWNER, INCLUDING WITHOUT LIMITATION, CHANGES ORDERED, INTERPRETATION OF THE CONTRACT DOCUMENTS BY THE OWNER OR ITS AUTHORIZED REPRESENTATIVE, OR ANY DISPUTE ARISING OUT OF INACCURACIES, DEFICIENCIES, DISCREPANCIES OR AMBIGUITIES IN THE CONTRACT DOCUMENTS, THEN SUBCONTRACTOR SHALL MAKE ALL CLAIMS PROMPTLY TO THE CONTRACTOR FOR ADDITIONAL COSTS, EXTENSIONS OF TIME, AND DAMAGES FOR DELAYS OR OTHER CAUSES IN ACCORDANCE WITH THE CONTRACT DOCUMENTS. ANY SUCH CLAIMS WHICH WILL AFFECT OR BECOME PART OF A CLAIM WHICH THE CONTRACTOR IS REQUIRED TO MAKE UNDER THE CONTRACT DOCUMENTS WITHIN A SPECIFIED TIME PERIOD OR IN A SPECIFIED MANNER SHALL BE MADE IN A TIMELY CLAIM SHALL BIND THE SUBCONTRACTOR TO THE SAME CONSEQUENCES AS THOSE TO WHICH THE CONTRACTOR IS BOUND. FAILURE OF THE SUBCONTRACTOR TO MAKE SUCH A TIMELY CLAIM SHALL BIND THE SUBCONTRACTOR TO THE SAME CONSEQUENCES AS THOSE TO WHICH THE CONTRACTOR IS BOUND. SUBCONTRACTOR SHALL BE BOUND BY ALL PROCEDURAL PROVISIONS, ADMINISTRATIVE DETERMINATIONS AND FINAL JUDGMENTS WHICH ARE BINDING ON THE CONTRACTOR AS TO SUCH CLAIMS. THE SUBCONTRACTOR SHALL BEAR THE EXPENSES AND THE BURDEN OF PROSECUTING AND PROVING ANY SUCH CLAIMS AGAINST THE OWNER AND SHALL GIVE THE CONTRACTOR ADEQUATE AND TIMELY NOTIFICATION IN WRITING OF ANY SUCH CLAIM OR DISPUTE ACTION IT DESIRES THE CONTRACTOR TO MAKE ON ITS BEHALF AGAINST THE OWNER. THE TERMS OF THE DISPUTE RESOLUTION AND CLAIMS PROCEDURE CONTAINED IN THE CONTRACT BETWEEN CONTRACTOR AND OWNER SHALL BE BINDING UPON SUBCONTRACTOR, WHETHER OR NOT THE SUBCONTRACTOR RECORDS OR FILES A MECHANIC'S LIEN, STOP NOTICE OR PROSECUTES SUIT THEREON OR AGAINST ANY BOND POSTED BY THE CONTRACTOR; AND SUBCONTRACTOR HEREBY ACKNOWLEDGES THAT THIS AGREEMENT WAIVES, AFFECTS AND IMPAIRS RIGHTS IT WOULD OTHERWISE HAVE IN CONNECTION WITH SUCH LIENS, STOP NOTICES AND SUITS ON SAID BONDS.

(B)  IF THE DISPUTE IS SOLELY BETWEEN THE CONTRACTOR AND SUBCONTRACTOR, THEN THE FOLLOWING DISPUTE RESOLUTION PROCEDURE SHALL APPLY:
(1) THE DISPUTE OR CONTROVERSY SHALL BE SUBMITTED BY ONE PARTY TO THE OTHER IN WRITING;
(2) THE PARTIES SHALL MAKE A GOOD FAITH ATTEMPT TO SETTLE SUCH DISPUTE;
(3) IF THE DISPUTE IS NOT SETTLED UNDER (1) AND (2), THEN THE PARTIES SHALL SUBMIT TO NONBINDING MEDIATION WITH THE PARTIES AGREEING ON A NEUTRAL MEDIATOR;
(4) ANY DISPUTES OR CONTROVERSIES NOT RESOLVED OR SETTLED BY THE PARTIES UNDER THE PREVIOUS PROVISIONS SHALL BE SUBMITTED TO BINDING ARBITRATION IN ACCORDANCE WITH THE CONSTRUCTION INDUSTRY RULES OF THE AMERICAN ARBITRATION ASSOCIATION AND ANY JUDGMENT UPON THE AWARD BY THE ARBITRATORS MAY BE ENTERED BY ANY COURT HAVING JURISDICTION. THE VENUE FOR ANY HEARING UNDER THIS ARBITRATION PROVISION SHALL BE IN DALLAS, DALLAS COUNTY, TEXAS.

(C)  DURING THE PENDENCY OF ANY DISPUTE UNDER THIS SUBCONTRACT, WHETHER IT INVOLVES THE OWNER OR ONLY THE CONTRACTOR, SUBCONTRACTOR SHALL CONTINUE WORKING AND WILL PROCEED ON ANY DISPUTED ITEMS OF WORK WITHOUT WAIVING ITS CLAIMS.

9.  **INSURANCE AND BONDS:**

9.1  **COMMERCIAL GENERAL AND UMBRELLA LIABILITY INSURANCE.** SUBCONTRACTOR SHALL MAINTAIN INSURANCE COVERAGES AS DEFINED IN THE PRIME CONTRACT BUT IN NO INSTANCE SHALL SUBCONTRACTOR'S INSURANCE PROVIDE LESS COVERAGE THAN THE FOLLOWING:
COMMERCIAL GENERAL LIABILITY (CGL) AND, IF NECESSARY, COMMERCIAL UMBRELLA INSURANCE WITH A LIMIT OF NOT LESS THAN $1,000,000 EACH OCCURRENCE. IF SUCH CGL INSURANCE CONTAINS A GENERAL AGGREGATE LIMIT, IT SHALL APPLY SEPARATELY TO THIS PROJECT.
(A)  CGL INSURANCE SHALL BE WRITTEN ON ISO OCCURRENCE FORM CG 00 01 10 (OR A SUBSTITUTE FORM PROVIDING EQUIVALENT COVERAGE) AND SHALL COVER LIABILITY ARISING FROM PREMISES, OPERATIONS, INDEPENDENT CONTRACTORS, PRODUCTS-COMPLETED OPERATIONS, PERSONAL INJURY AND ADVERTISING INJURY, AND LIABILITY ASSUMED UNDER AN INSURED CONTRACT (INCLUDING THE TORT LIABILITY OF ANOTHER ASSUMED ON A BUSINESS CONTRACT). THERE SHALL BE NO ENDORSEMENT OR MODIFICATION OF THE CGL LIMITING THE SCOPE OF COVERAGE FOR LIABILITY ARISING FROM POLLUTION, OR EMPLOYMENT-RELATED PRACTICES.
(B)  CONTRACTOR, OWNER AND THEIR AGENTS, OFFICERS, DIRECTORS, EMPLOYEES AND ANY OTHER PARTY REQUIRED UNDER THE PRIME CONTRACT SHALL BE INCLUDED AS AN INSURED UNDER THE CGL, USING ISO ADDITIONAL INSURED ENDORSEMENT CG 20 10 11 85 OR A SUBSTITUTE PROVIDING EQUIVALENT COVERAGE, AND UNDER THE COMMERCIAL UMBRELLA, IF ANY. THIS INSURANCE SHALL APPLY AS PRIMARY INSURANCE WITH RESPECT TO ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS AFFORDED TO CONTRACTOR OR OWNER.

Subcontractor Initials

(C) **WAIVER OF SUBROGATION.** SUBCONTRACTOR WAIVES ALL RIGHTS AGAINST CONTRACTOR, OWNER AND THEIR AGENTS, OFFICERS, DIRECTORS, EMPLOYEES AND ANY OTHER PARTY REQUIRED UNDER THE PRIME CONTRACT FOR RECOVERY OF DAMAGES TO THE EXTENT THESE DAMAGES ARE COVERED BY THE COMMERCIAL GENERAL LIABILITY OR COMMERCIAL UMBRELLA LIABILITY INSURANCE MAINTAINED PURSUANT TO PARAGRAPH 9.1 OF THIS SUBCONTRACT.

(D) **CONTINUING COMPLETED OPERATIONS LIABILITY INSURANCE.** SUBCONTRACTOR SHALL MAINTAIN COMMERCIAL GENERAL LIABILITY (CGL) AND, IF NECESSARY, COMMERCIAL UMBRELLA LIABILITY INSURANCE WITH A LIMIT OF NOT LESS THAN $1,000,000 EACH OCCURRENCE WITH COVERAGE AS SPECIFIED IN PARAGRAPH 9.1.A FOR AT LEAST 2 YEARS FOLLOWING SUBSTANTIAL COMPLETION OF THE WORK.

9.2   **BUSINESS AUTO AND UMBRELLA LIABILITY INSURANCE.** SUBCONTRACTOR SHALL MAINTAIN BUSINESS AUTO LIABILITY AND, IF NECESSARY, COMMERCIAL UMBRELLA LIABILITY INSURANCE WITH A LIMIT OF NOT LESS THAN $1,000,000 EACH ACCIDENT.

(A)   SUCH INSURANCE SHALL COVER LIABILITY ARISING OUT OF ANY AUTO (INCLUDING OWNED, HIRED, AND NON-OWNED AUTOS). BUSINESS AUTO COVERAGE SHALL BE WRITTEN ON ISO FORM CA 00 01, CA 00 05, CA 00 12, CA 00 20, OR A SUBSTITUTE FORM PROVIDING EQUIVALENT LIABILITY COVERAGE. IF NECESSARY, THE POLICY SHALL BE ENDORSED TO PROVIDE CONTRACTUAL LIABILITY COVERAGE EQUIVALENT TO THAT PROVIDED IN THE 1990 AND LATER EDITIONS OF CA 00 01.

(B)   **WAIVER OF SUBROGATION.** SUBCONTRACTOR WAIVES ALL RIGHTS AGAINST CONTRACTOR, OWNER AND THEIR AGENTS, OFFICERS, DIRECTORS, EMPLOYEES AND ANY OTHER PARTY REQUIRED UNDER THE PRIME CONTRACT FOR RECOVERY OF DAMAGES TO THE EXTENT THESE DAMAGES ARE COVERED BY THE BUSINESS AUTO LIABILITY OR COMMERCIAL UMBRELLA LIABILITY INSURANCE OBTAINED BY SUBCONTRACTOR PURSUANT TO PARAGRAPH 9.2 OF THIS SUBCONTRACT OR UNDER ANY APPLICABLE AUTO PHYSICAL DAMAGE COVERAGE.

9.3   **WORKERS COMPENSATION INSURANCE.** SUBCONTRACTOR SHALL MAINTAIN WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE. THE EMPLOYERS LIABILITY LIMITS SHALL NOT BE LESS THAN $500,000 EACH ACCIDENT FOR BODILY INJURY BY ACCIDENT OR $500,000 EACH EMPLOYEE FOR BODILY INJURY BY DISEASE. THE ALTERNATE EMPLOYER ENDORSEMENT (WC 00 03 01 A) SHALL BE ATTACHED SHOWING CONTRACTOR IN THE SCHEDULE AS THE ALTERNATE EMPLOYER.

(A)   **WAIVER OF SUBROGATION.** SUBCONTRACTOR WAIVES ALL RIGHTS AGAINST CONTRACTOR AND OWNER, AND THEIR AGENTS, OFFICERS, DIRECTORS AND EMPLOYEES FOR RECOVERY OF DAMAGES TO THE EXTENT THESE DAMAGES ARE COVERED BY THE WORKERS COMPENSATION POLICY INSURANCE OBTAINED BY SUBCONTRACTOR PURSUANT TO THIS PARAGRAPH.

9.4   **EVIDENCE OF INSURANCE.** PRIOR TO COMMENCING THE WORK, SUBCONTRACTOR SHALL FURNISH CONTRACTOR WITH A CERTIFICATE(S) OF INSURANCE INCLUDING WAIVERS OF SUBROGATION AND ADDITIONAL INSURED PROVISIONS, EXECUTED BY A DULY AUTHORIZED REPRESENTATIVE OF EACH INSURER, SHOWING COMPLIANCE WITH THE INSURANCE REQUIREMENTS SET FORTH ABOVE. ALL CERTIFICATES SHALL PROVIDE FOR 30 DAYS WRITTEN NOTICE TO CONTRACTOR PRIOR TO THE CANCELLATION OR MATERIAL CHANGE OF ANY INSURANCE REFERRED TO THEREIN. THE WORDS "ENDEAVOR TO" AND "BUT FAILED TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES" SHALL BE DELETED FROM THE CERTIFICATE FORM'S CANCELLATION PROVISION.

(A)   FAILURE OF CONTRACTOR TO DEMAND SUCH CERTIFICATE OR OTHER EVIDENCE OF FULL COMPLIANCE WITH THESE INSURANCE REQUIREMENTS OR FAILURE OF CONTRACTOR TO IDENTIFY A DEFICIENCY FROM EVIDENCE THAT IS PROVIDED SHALL NOT BE CONSTRUED AS A WAIVER OF SUBCONTRACTOR'S OBLIGATION TO MAINTAIN SUCH INSURANCE. CONTRACTOR SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, OF PROHIBITING SUBCONTRACTOR OR ANY SUBCONTRACTOR FROM ENTERING THE PROJECT SITE UNTIL SUCH CERTIFICATES OR OTHER EVIDENCE THAT INSURANCE HAS BEEN PLACED IN COMPLETE COMPLIANCE WITH THESE REQUIREMENTS IS RECEIVED AND APPROVED BY CONTRACTOR. FAILURE TO MAINTAIN THE REQUIRED INSURANCE MAY RESULT IN TERMINATION OF THIS SUBCONTRACT AT CONTRACTOR'S OPTION. IF SUBCONTRACTOR FAILED TO MAINTAIN THE INSURANCE AS SET FORTH HEREIN, CONTRACTOR SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO PURCHASE SAID INSURANCE AT SUBCONTRACTOR'S EXPENSE.

(B)   WITH RESPECT TO INSURANCE MAINTAINED AFTER FINAL PAYMENT IN COMPLIANCE WITH A REQUIREMENT ABOVE, AN ADDITIONAL CERTIFICATE(S) EVIDENCING SUCH COVERAGE SHALL BE PROMPTLY PROVIDED TO CONTRACTOR WHENEVER REQUESTED.

(C)   SUBCONTRACTOR SHALL PROVIDE CERTIFIED COPIES OF ALL INSURANCE POLICIES REQUIRED ABOVE WITHIN 10 DAYS OF CONTRACTOR'S WRITTEN REQUEST FOR SAID COPIES.

9.5   **REPRESENTATION OF COVERAGE ADEQUACY.** BY REQUIRING INSURANCE HEREIN, CONTRACTOR DOES NOT REPRESENT THAT COVERAGE AND LIMITS WILL NECESSARILY REPRESENT THAT COVERAGE AND LIMITS WILL NECESSARILY BE ADEQUATE TO PROTECT SUBCONTRACTOR, AND SUCH COVERAGE AND LIMITS SHALL NOT BE DEEMED AS A LIMITATION ON SUBCONTRACTOR'S LIABILITY UNDER THE INDEMNITIES GRANTED TO CONTRACTOR IN THIS SUBCONTRACT. SUBCONTRACTOR IS RESPONSIBLE FOR DEDUCTIBLE COST ON ANY INSURANCE CLAIM, INCLUDING BUILDERS' RISK PROVIDED BY OWNER OR CONTRACTOR.

9.6   **SUBCONTRACTORS' INSURANCE.** SUBCONTRACTOR SHALL CAUSE EACH SUBCONTRACTOR EMPLOYED BY SUBCONTRACTOR TO PURCHASE AND MAINTAIN INSURANCE OF THE TYPE, INDEMNITIES, CONDITIONS, WAIVERS OF SUBROGATION AND LIMITS AS SPECIFIED ABOVE. SUBCONTRACTOR SHALL FURNISH COPIES OF CERTIFICATES OF INSURANCE EVIDENCING SUCH COVERAGE FOR EACH SUBCONTRACTOR.

9.7   SUBCONTRACTOR IS FULLY RESPONSIBLE FOR ALL LOSS OR DAMAGE TO MATERIALS DELIVERED AND STORED ON THE JOBSITE UNTIL SUCH MATERIALS ARE ACTUALLY INSTALLED AND/OR INCORPORATED INTO THE JOB.

9.8   **PERFORMANCE AND PAYMENT BOND:** SUBCONTRACTOR SHALL PROVIDE PERFORMANCE AND PAYMENT BONDS IF REQUIRED BY CONTRACTOR, ON A FORM ACCEPTABLE TO CONTRACTOR, PRESCRIBED BY AND WITH A SURETY ACCEPTABLE TO CONTRACTOR IN THE FULL AMOUNT OF THIS SUBCONTRACT, FOR THE FAITHFUL PERFORMANCE OF THIS SUBCONTRACT. THE PREMIUM FOR BONDS SHALL BE PAID BY SUBCONTRACTOR AND THE COST SHALL BE INCLUDED IN SUBCONTRACT AMOUNT.

10.   **INDEMNIFICATION:**

10.1   TO THE FULLEST EXTENT PERMITTED BY LAW, SUBCONTRACTOR SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND THE OWNER, THE ARCHITECT AND THE CONTRACTOR AND ALL OF THEIR AGENTS AND EMPLOYEES FROM AND AGAINST ALL CLAIMS, DAMAGES, LOSSES AND EXPENSES, INCLUDING BUT NOT LIMITED TO ATTORNEYS' FEES, ARISING OUT OF OR RESULTING FROM THE PERFORMANCE OF THE SUBCONTRACTOR'S WORK UNDER THIS SUBCONTRACT, PROVIDED THAT ANY SUCH CLAIM, DAMAGE, LOSS OR EXPENSE (A) IS ATTRIBUTABLE TO BODILY INJURY, SICKNESS, DISEASE OR DEATH, OR TO INJURY TO OR DESTRUCTION OF TANGIBLE PROPERTY, INCLUDING LOSS OF USE RESULTING THEREFROM, AND (B) IS CAUSED OR ALLEGED TO BE CAUSED IN WHOLE OR IN PART BY ANY ACT OR OMISSION OF SUBCONTRACTOR OR ANYONE DIRECTLY OR INDIRECTLY EMPLOYED BY SUBCONTRACTOR OR ANYONE FOR WHOSE ACTS SUBCONTRACTOR MAY BE LIABLE, REGARDLESS OF WHETHER SUCH CLAIM, DAMAGE, LOSS OR EXPENSE IS CAUSED OR IS ALLEGED TO BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENT ACT OR OMISSION OF THE OWNER, THE ARCHITECT OR THE CONTRACTOR OR ANY OF THEIR AGENTS AND EMPLOYEES. HOWEVER, IN THOSE CASES WHERE THE CLAIM, LOSS, DAMAGE OR EXPENSE IS SUSTAINED BY A PERSON WHO IS NOT AN EMPLOYEE, AGENT, REPRESENTATIVE, OR INDEPENDENT CONTRACTOR OF SUBCONTRACTOR, SUBCONTRACTOR'S OBLIGATION TO INDEMNIFY THE OWNER, THE ARCHITECT OR THE CONTRACTOR OR ANY OF THEIR AGENTS AND EMPLOYEES FOR ANY CLAIM, DAMAGE, LOSS AND EXPENSE (INCLUDING ANY JUDGMENT, DECREE, ARBITRATION AWARD OR SETTLEMENT) SHALL EXTEND ONLY TO THE PERCENTAGE OF NEGLIGENCE OF SUBCONTRACTOR IN CONTRIBUTING TO SUCH CLAIM, DAMAGE, LOSS AND EXPENSE. IN ANY AND ALL CLAIMS AGAINST THE OWNER, THE ARCHITECT OR THE CONTRACTOR OR ANY OF THEIR AGENTS OR EMPLOYEES, BY ANY EMPLOYEE OF SUBCONTRACTOR, THE INDEMNIFICATION OBLIGATION UNDER THIS PARAGRAPH SHALL NOT BE LIMITED BY ANY LIMITATION ON THE AMOUNT OR TYPE OF DAMAGES, COMPENSATION OR BENEFITS PAYABLE BY OR FOR SUBCONTRACTOR UNDER WORKERS COMPENSATION ACTS, DISABILITY BENEFIT ACTS OR OTHER EMPLOYEE BENEFIT ACTS. SUBCONTRACTOR'S OBLIGATIONS HEREUNDER SHALL NOT BE CONSTRUED TO NEGATE, ABRIDGE, OR OTHERWISE REDUCE OTHER RIGHTS OR OBLIGATIONS OF INDEMNITY WHICH WOULD OTHERWISE EXIST AS TO A PARTY OR PERSON DESCRIBED IN THIS PARAGRAPH.

10.2   THE CONTRACTOR IN ITS SOLE DISCRETION AND ITS SOLE OPTION, MAY (i) TENDER THE DEFENSE OF ANY OR ALL OF THE INDEMNIFIED CLAIMS TO SUBCONTRACTOR, IN WHICH CASE AND UPON SUCH TENDER THE SUBCONTRACTOR, AT ITS OWN COST, SHALL DEFEND SUCH TENDERED CLAIMS THROUGH COUNSEL APPROVED BY CONTRACTOR OR (ii) DEFEND ANY OR ALL OF THE INDEMNIFIED CLAIMS.

10.3   THE OBLIGATIONS OF SUBCONTRACTOR UNDER THIS ARTICLE 10 SHALL NOT EXTEND TO THE LIABILITY OF THE ARCHITECT, THE ARCHITECT'S CONSULTANTS, AGENTS OR EMPLOYEES OF ANY OF THEM, ARISING OUT OF:

10.3 (a) THE PREPARATION OR APPROVAL OF MAPS, DRAWINGS, OPINIONS, REPORTS, SURVEYS, CHANGE ORDERS, DESIGNS OR SPECIFICATIONS, OR

10.3 (b) THE GIVING OF OR FAILURE TO GIVE DIRECTIONS OR INSTRUCTIONS BY THE ARCHITECT, THE ARCHITECT'S CONSULTANTS, AND AGENTS OR EMPLOYEES OF ANY OF THEM PROVIDED SUCH GIVING OR FAILURE TO GIVE IS THE PRIMARY CAUSE OF THE INJURY OR DAMAGE.

11.   **GUARANTY:** SUBCONTRACTOR SHALL, BEFORE REQUESTING FINAL PAYMENT, PROVIDE ANY AND ALL GUARANTIES REQUIRED BY THE PRIME CONTRACT. IN ADDITION TO ANY SPECIFIED GUARANTY PROVIDED BY THE PRIME CONTRACT, SUBCONTRACTOR, IN SIGNING THIS SUBCONTRACT, AGREES AT HIS OWN EXPENSE TO REPLACE OR REPAIR ANY FAULTY OR DEFECTIVE MATERIAL OR WORKMANSHIP WITHIN ONE YEAR FROM THE DAY OF NOTICE OF COMPLETION OF THE PROJECT, OR OWNER'S BENEFICIAL OCCUPANCY, WHICHEVER OCCURS FIRST. IN ADDITION, SUBCONTRACTOR SHALL BE RESPONSIBLE AND PAY FOR REPLACEMENT OR REPAIR OF ADJACENT MATERIALS OR WORK WHICH MAY BE DAMAGED DUE TO THE FAILURE OF SUBCONTRACTOR'S MATERIAL OR WORK AND/OR DAMAGED AS A RESULT OF THE REPLACEMENT OR REPAIRS THEREOF.

Subcontractor Initials

**12.    APPLICATION FOR PAYMENT:**

12.1    PRIOR TO SUBMISSION OF SUBCONTRACTOR'S FIRST MONTHLY PAYMENT REQUEST, CONTRACTOR MAY REQUIRE SUBCONTRACTOR TO SUBMIT, FOR CONTRACTOR'S WRITTEN APPROVAL, A PAY REQUEST BREAKDOWN FORM LISTING THE MAJOR ELEMENTS OF THE SUBCONTRACT AND THE DOLLAR VALUE OF EACH. THIS FORM, IF REQUIRED, SHALL BE COMPLETED BY SUBCONTRACTOR EACH MONTH TO SHOW THE PROPORTIONATE AMOUNT OF EACH ELEMENT COMPLETED TO DATE AND SUBMITTED TO CONTRACTOR ATTACHED TO THE PAYMENT REQUEST FORM.

12.2    SUBCONTRACTOR MUST SUBMIT TO CONTRACTOR AN ITEMIZED APPLICATION FOR PAYMENT, NOTARIZED, IF REQUIRED BY APPLICABLE LAW OR REQUESTED BY OWNER OR CONTRACTOR, SUPPORTED BY SUCH DATA SUBSTANTIATING THE SUBCONTRACTOR'S RIGHT TO PAYMENT AS CONTRACTOR, OWNER OR THE ARCHITECT MAY REQUIRE, INCLUDING REQUISITIONS FROM SUBCONTRACTORS AND SUB-SUBCONTRACTORS.

12.3    SUBCONTRACTOR SHALL, AS PART OF EACH REQUEST FOR PARTIAL PAYMENT OTHER THAN THE INITIAL REQUEST, FURNISH CLAIM RELEASES AND LIEN WAIVERS WITH RESPECT TO ALL WORK PERFORMED AND MATERIALS SUPPLIED THROUGH THE DATE OF THE IMMEDIATELY PRECEDING REQUEST FOR PARTIAL PAYMENT FOR WHICH PAYMENT HAS BEEN MADE. PRIOR TO FINAL PAYMENT, SUBCONTRACTOR SHALL PROVIDE TO CONTRACTOR A RELEASE OF ITS LIENS AND CLAIMS AND ALL LIENS AND CLAIMS OF ALL PERSONS FURNISHING LABOR AND/OR MATERIALS FOR THE PERFORMANCE OF THIS SUBCONTRACT, AND SATISFACTORY EVIDENCE THAT THERE ARE NO OTHER LIENS OR CLAIMS WHATSOEVER OUTSTANDING AGAINST THE WORK RELATING TO THIS SUBCONTRACT.

12.4    SUBCONTRACTOR SHALL SUBMIT HIS MONTHLY PAYMENT REQUEST ON ROGERS-O'BRIEN'S BILLING FORM WITH A COMPLETED AIA G703 DOCUMENT (ATTACHED) ON OR BEFORE THE __20TH__ DAY OF EACH MONTH. INVOICES RECEIVED AFTER THE __20TH__ DAY OF EACH MONTH WILL BE CONSIDERED AS THE NEXT SUCCEEDING MONTH'S BUSINESS.

12.5    IF THE CONTRACT DOCUMENTS ALLOW PARTIAL PAYMENT FOR MATERIALS STORED EITHER OFF-SITE OR ON-SITE, SUCH PAYMENTS SHALL BE MADE TO SUBCONTRACTOR IN THE AMOUNTS AND UNDER THE STANDARDS SET FORTH IN THE CONTRACT DOCUMENTS FOR OFF-SITE OR ON-SITE STORED MATERIALS ONCE SUCH PAYMENTS HAVE BEEN APPROVED BY CONTRACTOR AND THE OWNER, BUT ONLY AFTER CONTRACTOR'S RECEIPT OF PAYMENT THEREFOR FROM THE OWNER.

12.6    NO PARTIAL PAYMENT SHALL BE DUE SUBCONTRACTOR UNLESS AND UNTIL CONTRACTOR RECEIVES PAYMENT FROM OWNER AND PROVIDED THAT THE WORK HAS BEEN APPROVED BY CONTRACTOR AND THE OWNER AND PROVIDED THAT SUBCONTRACTOR IS IN COMPLIANCE WITH THE TERMS OF ITS SUBCONTRACT. FINAL PAYMENT SHALL NOT BE DUE UNTIL SUBCONTRACTOR'S WORK HAS BEEN COMPLETED AND APPROVED BY THE OWNER, THE ENTIRE PROJECT IS COMPLETE, ALL FINAL PAYMENT PREREQUISITES UNDER THE CONTRACT DOCUMENTS HAVE BEEN SATISFIED, SATISFACTORY PROOF OF PAYMENT OF ALL AMOUNTS OWED BY SUBCONTRACTOR IN CONNECTION WITH THIS SUBCONTRACT HAS BEEN PROVIDED AND CONTRACTOR HAS BEEN PAID IN FULL FOR THE ENTIRE PROJECT. NOTWITHSTANDING THE ABOVE, CONTRACTOR MAY WITHHOLD FROM ANY PARTIAL OR FINAL PAYMENT TO SUBCONTRACTOR SUCH AMOUNTS AS MAY BE ALLOWED BY THE SUBCONTRACT IN PARAGRAPH 13. NO CERTIFICATION OF PROGRESS PAYMENT AND NO PARTIAL NOR FINAL PAYMENT MADE TO SUBCONTRACTOR PURSUANT TO THIS SUBCONTRACT SHALL CONSTITUTE OR IMPLY ACCEPTANCE OF WORK OR MATERIALS. SUBCONTRACTOR EXPRESSLY ASSUMES THE RISK OF NON-PAYMENT BY THE OWNER TO THE CONTRACTOR FOR SUBCONTRACTOR'S WORK FOR ANY REASON INCLUDING OWNER'S FINANCIAL INABILITY TO PAY OR REFUSAL TO PAY FOR ANY REASON. IN ADDITION TO THE ABOVE CONDITIONS SUBCONTRACTOR ACKNOWLEDGES THAT ALL PAYMENTS TO SUBCONTRACTOR SHALL BE MADE SOLELY OUT OF FUNDS ACTUALLY RECEIVED BY CONTRACTOR FROM OWNER.

12.7    CONTRACTOR SHALL RETAIN 10% OF THE GROSS AMOUNT OF EACH MONTHLY PAYMENT REQUEST OR 10% OF SO MUCH THEREOF AS IS APPROVED FOR PAYMENT, WHICHEVER IS LESS; SUCH SUM SHALL BE ACCUMULATED AND NOT BE RELEASED TO SUBCONTRACTOR UNTIL FINAL PAYMENT IS DUE.

12.8    CONTRACTOR, AFTER GIVING A THREE (3) DAY NOTICE TO SUBCONTRACTORS, MAY PAY ALL PERSONS WHO HAVE NOT BEEN PAID THE MONIES DUE THEM IN CONNECTION WITH THE SUBCONTRACT, WHETHER OR NOT A LIEN HAS BEEN FILED, UNLESS SUBCONTRACTOR, WITHIN THREE DAYS OF RECEIPT OF SAID NOTICE, OR SUCH SHORTER PERIOD OF TIME AS CONTRACTOR FINDS NECESSARY TO MEET ITS OBLIGATIONS TO THE OWNER (I) DEMONSTRATES THAT SUCH SUMS ARE NOT DUE AND (II) PROVIDES CONTRACTOR ADEQUATE SECURITY. CONTRACTOR, WITHOUT PREJUDICE TO ANY OTHER RIGHT IT MAY HAVE, MAY ALSO ISSUE A JOINT CHECK TO SUBCONTRACTOR AND ANY LOWER-TIER SUBCONTRACTOR OR SUPPLIER OF SUBCONTRACTOR AND THE DELIVERY OF SAID JOINT CHECK TO THE LOWER-TIER SUBCONTRACTOR OR SUPPLIER SHALL CONSTITUTE PAYMENT TO SUBCONTRACTOR.

12.9    ALL MATERIAL AND WORK INCORPORATED INTO THE PROJECT OR FOR WHICH PARTIAL PAYMENT HAS BEEN MADE SHALL BECOME THE PROPERTY OF CONTRACTOR, OR IF THE CONTRACT DOCUMENTS SO PROVIDE, THE PROPERTY OF THE OWNER; HOWEVER, THIS PROVISION SHALL NOT RELIEVE SUBCONTRACTOR FROM THE SOLE RESPONSIBILITY AND LIABILITY FOR ALL WORK AND MATERIALS FOR WHICH PAYMENTS HAVE BEEN MADE UNTIL FINAL ACCEPTANCE THEREOF BY THE OWNER.

**13.    PAYMENTS WITHHELD:**

13.1    NOTWITHSTANDING ANY PROVISION OF THE SUBCONTRACT TO THE CONTRARY, CONTRACTOR IS NOT OBLIGATED TO MAKE ANY PAYMENT TO SUBCONTRACTOR UNDER THE SUBCONTRACT IF ANY ONE OR MORE OF THE FOLLOWING CONDITIONS EXISTS:

13.1.1    SUBCONTRACTOR HAS FAILED TO PERFORM ITS OBLIGATIONS UNDER THE SUBCONTRACT OR OTHERWISE IS IN DEFAULT UNDER THE SUBCONTRACT OR THE CONTRACT DOCUMENTS;

13.1.2    IF ANY PART OF SUCH PAYMENT IS ATTRIBUTABLE TO WORK WHICH IS NOT PERFORMED IN ACCORDANCE WITH THE CONTRACT DOCUMENTS; PROVIDED, HOWEVER, PAYMENT WILL BE MADE FOR THE PORTIONS OF THE WORK WHICH HAVE BEEN PERFORMED IN ACCORDANCE WITH THE CONTRACT DOCUMENTS;

13.1.3    SUBCONTRACTOR OR ANY SUBCONTRACTOR HAS FAILED TO MAKE PAYMENTS PROMPTLY TO ANY LOWER-TIER SUBCONTRACTOR, AS APPLICABLE, OR TO PAY FOR MATERIAL OR LABOR USED IN THE WORK FOR WHICH SUBCONTRACTOR HAS RECEIVED PAYMENT;

13.1.4    SUBCONTRACTOR HAS FAILED TO PROVIDE THE REVISED SCHEDULE OF VALUES WITH THE APPLICATION FOR PAYMENT;

13.1.5    SUBCONTRACTOR HAS SUSPENDED THE WORK OTHER THAN AS AUTHORIZED BY OWNER OR THE CONTRACT;

13.1.6    SUBCONTRACTOR HAS FILED A VOLUNTARY PETITION FOR PROTECTION OR RELIEF UNDER -- OR A PETITION HAS BEEN FILED PLACING SUBCONTRACTOR UNDER -- THE PROTECTION OF THE BANKRUPTCY LAWS OF THE UNITED STATES AND SUBCONTRACTOR HAS NOT (1) NOTIFIED CONTRACTOR THAT SUBCONTRACTOR HAS THE NECESSARY CAPACITY AND RESOURCES TO FINISH THE WORK AND HONOR THE SUBCONTRACT AND WILL DISMISS SUCH PETITION AND REMOVED ITSELF FROM BANKRUPTCY PROTECTION WITHIN 90 DAYS OF THE FILING OR (2) AFFIRMED AND HAD THE BANKRUPTCY COURT APPROVE ITS OBLIGATIONS UNDER THIS SUBCONTRACT TO CONTRACTOR AND EVIDENCE SUBCONTRACTOR'S ABILITY TO PERFORM THIS SUBCONTRACT TO CONTRACTOR'S REASONABLE SATISFACTION; OR

13.1.7    IF, IN CONTRACTOR'S REASONABLE JUDGMENT, SUBCONTRACTOR EITHER (1) APPEARS INSOLVENT (2) DOES NOT HAVE SUFFICIENT RESOURCES (FINANCIAL OR PERSONNEL) TO COMPLETE THE PROJECT OR (3) THE AMOUNTS REMAINING IN THE UNPAID BALANCE OF THE SUBCONTRACT IS NOT SUFFICIENT TO PAY FOR THE LABOR AND MATERIALS TO BE PROVIDED BY SUBCONTRACTOR;

13.1.8    SUBCONTRACTOR HAS FAILED TO PROVIDE OR MAINTAIN REQUIRED INSURANCE AND BONDS; OR

13.1.9    CONTRACTOR DETERMINES THAT SUBCONTRACTOR HAS BREACHED ANY OTHER AGREEMENT IT MIGHT HAVE WITH CONTRACTOR ON ANY OTHER PROJECT.

13.2    IN THE EVENT ANY OF THE CONDITIONS AS OUTLINED ABOVE EXISTS, CONTRACTOR MAY WITHHOLD SUCH FUNDS AS MAY BE REASONABLY NECESSARY TO PROTECT IT FROM LIABILITY OR COMPENSATE IT FOR ITS DAMAGES; PROVIDED, HOWEVER, THAT THE EXERCISING OF THE RIGHT OF WITHHOLDING BY CONTRACTOR SHALL NOT BE CONCLUSIVE WITH RESPECT TO ANY LIABILITY OF SUBCONTRACTOR TO CONTRACTOR. CONTRACTOR SHALL NOT BE LIABLE TO SUBCONTRACTOR FOR ANY WITHHOLDING PROVIDED CONTRACTOR HAS ACTED IN GOOD FAITH.

**14.    DIRECTION OF SUBLET WORK:** IT IS UNDERSTOOD THAT SUBCONTRACTOR IS AN INDEPENDENT CONTRACTOR AND CONTRACTOR SHALL HAVE NO RIGHT TO DIRECT THE OPERATIONS OR EMPLOYEES OF SUBCONTRACTOR. SUBCONTRACTOR AGREES TO MAINTAIN A FAMILIARITY WITH CONDITIONS EXISTING OVER THE ENTIRE PROJECT ON WHICH THE WORK IS LOCATED SO THAT HE WILL BE AWARE OF DANGEROUS CONDITIONS, WHETHER OBVIOUS OR HIDDEN, AND SUBCONTRACTOR AGREES TO WARN ITS EMPLOYEES, SUBCONTRACTORS AND SUPPLIERS OF UNSAFE CONDITIONS ON THE PROJECT PREMISES.

**15.    FUTURE RIGHTS:** ANY WAIVER OR FAILURE TO ASSERT ANY RIGHT WHICH EITHER PARTY HAS UNDER THIS SUBCONTRACT SHALL NOT CONSTITUTE A CONTINUING WAIVER OF FUTURE RIGHTS. RIGHTS CAN BE WAIVED ONLY IF EXPRESSED IN WRITING SIGNED BY THE WAIVING PARTY. IF ANY PROVISION OF THIS SUBCONTRACT IS HELD INVALID OR UNENFORCEABLE UNDER ANY PRESENT OR FUTURE LAWS, THEN THE REMAINDER OF THE SUBCONTRACT SHALL REMAIN IN EFFECT.

Subcontractor Initials

16. **FAILURE TO PERFORM:** SHOULD SUBCONTRACTOR AT ANY TIME FAIL TO SUPPLY A SUFFICIENT NUMBER OF SKILLED WORKMEN OR A SUFFICIENT QUANTITY OF MATERIALS OF PROPER QUALITY, OR FAIL IN ANY RESPECT TO PROSECUTE THE WORK COVERED BY THIS SUBCONTRACT WITH PROMPTNESS AND DILIGENCE, OR FAIL TO PERFORM WORK PERFORMING WORK COVERED BY THIS SUBCONTRACT ENGAGE IN A STRIKE OR OTHER STOPPAGE OR CEASE TO WORK DUE TO PICKETING OR OTHER SUCH ACTIVITY, CONTRACTOR MAY, IN ANY OF SUCH EVENTS AT ITS OPTION, AFTER FORTY-EIGHT HOURS WRITTEN NOTICE TO SUBCONTRACTOR, PROVIDE ANY SUCH LABOR AND MATERIALS AND DEDUCT THE COST THEREOF FROM ANY MONEY THEN DUE OR THEREAFTER TO BECOME DUE SUBCONTRACTOR, OR, IN ANY OF SUCH EVENTS, CONTRACTOR MAY, AT ITS OPTION, TERMINATE THE EMPLOYMENT OF SUBCONTRACTOR FOR THE WORK UNDER THIS SUBCONTRACT AND SHALL HAVE THE RIGHT TO ENTER UPON THE PROJECT PREMISES AND TAKE POSSESSION, FOR THE PURPOSE OF COMPLETING THE WORK HEREUNDER, OF ALL THE MATERIALS, TOOLS, AND EQUIPMENT THEREON, AND TO FINISH THE WORK AND PROVIDE THE MATERIALS, THEREFOR, EITHER WITH ITS OWN EMPLOYEES OR OTHER SUBCONTRACTORS; AND IN CASE OF SUCH DISCONTINUANCE OF THE EMPLOYMENT BY CONTRACTOR, SUBCONTRACTOR SHALL NOT BE ENTITLED TO RECEIVE ANY FURTHER PAYMENTS UNDER THIS SUBCONTRACT OR OTHERWISE, BUT SHALL NEVERTHELESS REMAIN LIABLE FOR ANY DAMAGES WHICH CONTRACTOR INCURS; IF THE EXPENSES INCURRED BY CONTRACTOR IN COMPLETING THE WORK SHALL EXCEED THE UNPAID BALANCE, SUBCONTRACTOR SHALL PAY THE DIFFERENCE TO CONTRACTOR, ALONG WITH ANY OTHER DAMAGES INCURRED BY CONTRACTOR AS A RESULT OF SUBCONTRACTOR'S DEFAULT. CONTRACTOR SHALL HAVE A LIEN UPON ALL MATERIALS, TOOLS, AND APPLIANCES TAKEN POSSESSION OF TO SECURE THE PAYMENT THEREOF. SUBCONTRACTOR SHALL BE LIABLE TO CONTRACTOR FOR ALL COSTS AND DAMAGES INCURRED BY CONTRACTOR DUE TO THE FAILURE OF PERFORMANCE BY SUBCONTRACTOR. THE FAILURE OF SUBCONTRACTOR TO KEEP THE PROGRESS OF WORK UP TO THAT OF CONTRACTOR OR OTHER TRADES, OR THE FAILURE TO EXECUTE ITS WORK AS DIRECTED BY CONTRACTOR. SUBCONTRACTOR AGREES TO EXECUTE ANY ASSIGNMENTS NECESSARY TO MAKE AVAILABLE TO CONTRACTOR AND THE OWNER THE RIGHTS OF SUBCONTRACTOR UNDER PURCHASE ORDERS AND SUBCONTRACTS. CONTRACTOR WILL CREDIT SUBCONTRACTORS ACCOUNT WITH THE VALUE OF THE MATERIALS AND SUPPLIES SO USED BUT THERE WILL BE NO CREDIT FOR RENT ON EQUIPMENT. SUBCONTRACTOR WILL REIMBURSE CONTRACTOR IN DALLAS COUNTY, TEXAS, TO THE EXTENT THAT CONTRACTOR'S EXPENSE INCLUDING ATTORNEYS FEES IN COMPLETING THE SUBLET WORK AND PROCEEDING UNDER THIS ARTICLE EXCEEDS THE BALANCE WHICH WOULD HAVE BEEN DUE TO SUBCONTRACTOR UNDER THIS SUBCONTRACT HAD SUBCONTRACTOR COMPLETED THE SUBLET WORK, AFTER DEDUCTING AMOUNTS PREVIOUSLY PAID EXPENSE IS LESS THAN SUCH AMOUNT, THEN CONTRACTOR WILL PAY THE DIFFERENCE TO SUBCONTRACTOR. SUBCONTRACTOR HEREBY WAIVES ALL CLAIMS AGAINST CONTRACTOR FOR PROFITS, RENT OR EQUIPMENT OR OTHER DAMAGES RELATED TO ANY PROCEEDING WHICH CONTRACTOR INSTITUTES UNDER THIS ARTICLE. THE PARTIES AGREE THAT THE TERMS OF THIS ARTICLE SHALL BE BINDING IF CONTRACTOR IN GOOD FAITH HAS MADE A REASONABLE DETERMINATION THAT SUBCONTRACTOR'S PERFORMANCE IS INADEQUATE AND THAT THE OWNER OR CONTRACTOR OR OTHER SUBCONTRACTORS MAY BE ABLE TO PERFORM ITS CONTRACTUAL OBLIGATIONS, UNLESS CONTRACTOR PROCEEDS UNDER THIS ARTICLE, THE PARTIES AGREE THAT SUCH DETERMINATIONS ARE DIFFICULT TO MAKE AND MUST BE MADE UNDER PRESSING CIRCUMSTANCES, AND AGREE TO BE BOUND IN ACCORDANCE WITH THIS ARTICLE IN LIGHT OF THE CIRCUMSTANCES CONFRONTING CONTRACTOR AT THE TIME SUCH DECISION IS MADE.

17. **LAYOUT RESPONSIBILITY:** CONTRACTOR SHALL ESTABLISH PRINCIPAL AXIS LINES AND LEVELS WHEREUPON SUBCONTRACTOR SHALL LAY OUT AND SHALL BE STRICTLY RESPONSIBLE FOR THE ACCURACY OF HIS WORK AND FOR ANY LOSS OR DAMAGE TO OTHER CONTRACTORS ENGAGED IN WORK ON THE SITE BY REASON OF FAILURE OF SUBCONTRACTOR TO SET OUT OR PERFORM HIS WORK CORRECTLY. SUBCONTRACTOR SHALL EXERCISE PRUDENCE SO THAT ACTUAL FINAL CONDITIONS AND DETAILS SHALL RESULT IN PERFECT ALIGNMENT OF FINISHED SURFACES.

18. **TERMS OF SUBCONTRACT:** EACH OF THE PARTIES HERETO AGREES AND REPRESENTS THAT THIS SUBCONTRACT COMPRISES THE FULL AND ENTIRE AGREEMENT BETWEEN THE PARTIES AFFECTING THE WORK CONTEMPLATED, AND NO OTHER AGREEMENT OR UNDERSTANDING OF ANY NATURE CONCERNING THE SAME HAS BEEN ENTERED INTO OR WILL BE RECOGNIZED, AND THAT ALL NEGOTIATIONS, ACTS, WORK PERFORMED, OR PAYMENTS MADE PRIOR TO THE EXECUTION HEREOF SHALL BE DEEMED MERGED IN, INTEGRATED AND SUPERSEDED BY THIS SUBCONTRACT. THIS AGREEMENT CAN BE MODIFIED ONLY BY WRITTEN AGREEMENT SIGNED BY AUTHORIZED REPRESENTATIVES OF EACH PARTY HERETO. THE HEADINGS OF THE ARTICLES, IN EMPHASIZED TYPE, ARE FOR CONVENIENCE AND ARE NOT TO BE CONSIDERED IN CONSTRUING THE MEANING OF THIS SUBCONTRACT.

19. **SUB-SUBCONTRACTOR:** SUBCONTRACTOR MUST SUBMIT TO CONTRACTOR FOR APPROVAL ALL HIS PROPOSED SUBCONTRACTORS (SUB-SUBCONTRACTOR), AND CONTRACTOR MAY REJECT ANY PROPOSED SUB-SUBCONTRACTOR. APPROVAL OF A SUB-SUBCONTRACTOR WILL NOT IMPLY THAT CONTRACTOR ASSUMES ANY RESPONSIBILITY FOR SUCH SUB-SUBCONTRACTOR OR THAT SUBCONTRACTOR IS RELIEVED OF ANY RESPONSIBILITY WITH RESPECT TO THE SUBLET WORK. SUB-SUBCONTRACTOR MUST BE BOUND TO THE PROVISIONS OF THIS SUBCONTRACT INCLUDING ALL INDEMNIFICATION AND INSURANCE REQUIREMENTS.

20. **BANKRUPTCY OR ASSIGNMENTS:** IF ALL OR SUBSTANTIALLY ALL OF SUBCONTRACTOR'S ASSETS ARE PLACED IN THE HANDS OF A RECEIVER OR TRUSTEE, OR IF SUBCONTRACTOR MAKES AN ASSIGNMENT FOR THE BENEFIT OF CREDITORS OR MAKES AN ASSIGNMENT TO ANY THIRD PARTY OR IS ADJUDICATED A BANKRUPT, OR IF SUBCONTRACTOR INSTITUTES ANY PROCEEDINGS UNDER THE BANKRUPTCY ACT OR ANY AMENDMENT THERETO OR UNDER ANY OTHER ACT RELATING TO THE SUBJECT OF BANKRUPTCY WHEREIN SUBCONTRACTOR SEEKS TO BE ADJUDICATED A BANKRUPT, OR TO BE DISCHARGED OF ITS DEBTS, OR TO EFFECT A PLAN OF LIQUIDATION, COMPOSITION OR REORGANIZATION OR SHOULD ANY INVOLUNTARY PROCEEDING BE FILED AGAINST SUBCONTRACTOR UNDER ANY SUCH LAW AND THE SUBCONTRACTOR CONSENTS THERETO OR ACQUIESCES THEREIN BY PLEADING OR DEFAULT, OR IF CONTRACTOR IS SERVED WITH A U.S. TAX LEVY SEEKING TO REACH ASSETS OF SUBCONTRACTOR, THEN CONTRACTOR SHALL HAVE THE RIGHT, IN ADDITION TO ANY OTHER RIGHT OR REMEDY UNDER THIS SUBCONTRACT OR BY LAW, TO TERMINATE THIS SUBCONTRACT. IF THE SUBCONTRACT IS SO TERMINATED, SUBCONTRACTOR WILL REIMBURSE CONTRACTOR IN DALLAS COUNTY, TEXAS, TO THE EXTENT THAT CONTRACTOR'S EXPENSE, INCLUDING ATTORNEYS FEES, IN COMPLETING THE SUBLET WORK AND PROCEEDING UNDER THIS ARTICLE, EXCEEDS THE BALANCE WHICH WOULD HAVE BECOME DUE TO SUBCONTRACTOR UNDER THIS SUBCONTRACT HAD SUBCONTRACTOR COMPLETED THE SUBLET WORK, AFTER DEDUCTING AMOUNTS PREVIOUSLY PAID TO SUBCONTRACTOR; IF CONTRACTOR'S EXPENSE IS LESS THAN SUCH AMOUNT, THEN CONTRACTOR WILL PAY THE DIFFERENCES TO SUBCONTRACTOR. REGARDLESS WHETHER CONTRACTOR ELECTS TO TERMINATE THIS SUBCONTRACT OR PURSUE OTHER RIGHTS, IT IS AGREED THAT UPON THE HAPPENING OF ANY OF THE FOREGOING EVENTS CONTRACTOR MAY WITHHOLD PAYMENT FROM SUBCONTRACTOR SUFFICIENT TO REIMBURSE CONTRACTOR FOR SUMS WHICH SUBCONTRACTOR OWES OR WILL OWE CONTRACTOR UNDER THIS SUBCONTRACT.

21. **COMPLIANCE WITH LAWS:** SUBCONTRACTOR AGREES TO COMPLY, AT HIS OWN EXPENSE, WITH ALL LAWS AND REGULATIONS APPLICABLE TO THE WORK COVERED BY THE PRIME CONTRACT, INCLUDING BUT NOT LIMITED TO THE OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970 (PUBLIC LAW 91-596) CODE OF FEDERAL REGULATIONS ON HAZARDOUS WASTE (CFR40); CONSTRUCTION SAFETY ACT (PUBLIC LAW 91-54); AND THE CIVIL RIGHTS ACT OF 1970 AS AMENDED, INCLUDING RULES AND REGULATIONS PROMULGATED THEREUNDER AND INCLUDING EXECUTIVE ORDER 11246 AND ANY SUCCESSOR EXECUTIVE ORDER MODIFYING OR SUPERSEDING THAT ORDER; AND SUBCONTRACTOR AGREES TO SAVE AND HOLD HARMLESS THE CONTRACTOR FROM ANY AND ALL LIABILITY AND DAMAGES, FINES, COSTS, AND ATTORNEYS FEES INCURRED BY CONTRACTOR ON ACCOUNT OF SUBCONTRACTOR'S FAILURE TO COMPLY WITH ALL LAWS AND GOVERNMENTAL REGULATIONS APPLICABLE TO THE WORK. SUBCONTRACTOR AGREES TO NOT REMOVE GUARDS OR SAFETY APPLIANCES, EXCEPT ON AUTHORITY OF CONTRACTOR'S SUPERINTENDENT, AND TO REPLACE SUCH GUARDS AND APPLIANCES PROMPTLY. FAILURE TO MAKE SUCH REPLACEMENT WILL AUTHORIZE CONTRACTOR TO DO SUCH WORK AND CHARGE THE COSTS THEREOF TO SUBCONTRACTOR. SUBCONTRACTOR WARRANTS THAT HE WILL COMPLY WITH ALL STATUTES AND PROVISIONS OF IMMIGRATION REFORM & CONTROL ACT OF 1986.

22. **CLEANUP:** SUBCONTRACTOR ACKNOWLEDGES THAT THE EXECUTION OF HIS WORK WILL RESULT IN AN INDETERMINATE AMOUNT OF DEBRIS. SUBCONTRACTOR AGREES TO RETRIEVE, PICK UP AND REMOVE FROM THE JOBSITE ALL SUCH DEBRIS DURING THE COURSE OF HIS WORK AND ON FINAL COMPLETION OF HIS WORK. DISPOSAL OF DEBRIS SHALL BE DONE ON A DAY-TO-DAY BASIS AS IS DETERMINED NECESSARY BY CONTRACTOR. IF AFTER 24 HOURS NOTICE BY CONTRACTOR'S REPRESENTATIVE IS SUBCONTRACTOR'S REPRESENTATIVE AT THE JOBSITE, SUBCONTRACTOR HAS NOT DILIGENTLY PROCEEDED WITH THE CLEANUP AS OUTLINED IN THIS PARAGRAPH, THEN CONTRACTOR HAS THE RIGHT TO PROCEED WITH THE CLEANUP WORK WITH HIS OWN LABOR AT SUBCONTRACTOR'S EXPENSE.

23. **ASSIGNMENT, SUBLETTING, ETC:** SUBCONTRACTOR CANNOT ASSIGN, TRANSFER, CONVEY, SUBLET, OR OTHERWISE DISPOSE OF THIS SUBCONTRACT OR ANY PART THEREOF, OR HIS RIGHT, TITLE OR INTEREST THEREIN, OR HIS POWER TO EXECUTE THE SAME, WITHOUT THE CONSENT IN WRITING OF CONTRACTOR. IF SUBCONTRACTOR DOES, WITH APPROVAL, SUBLET THIS SUBCONTRACT OR ANY PART THEREOF, HE SHALL REQUIRE THAT HIS SUBCONTRACTOR BE BOUND TO HIM AND TO ASSUME TOWARD HIM ALL OF THE OBLIGATIONS AND RESPONSIBILITIES THAT HE HAS ASSUMED TOWARD CONTRACTOR.

24. **PERMITS:** ALL PERMITS (EXCEPT CONTRACTOR'S MAIN BUILDING PERMIT), LICENSES, TAP FEES AND EASEMENTS NECESSARY FOR THE PROSECUTION OF THE SUBLET WORK SHALL BE PROCURED AND PAID FOR BY SUBCONTRACTOR. SUBCONTRACTOR SHALL GIVE ALL NOTICES AND COMPLY WITH ALL LAWS, ORDINANCES, RULES, AND REGULATIONS BEARING ON THE CONDUCT OF THE WORK AS DRAWN AND SPECIFIED. IF SUBCONTRACTOR OBSERVES THAT PLANS AND SPECIFICATIONS ARE AT VARIANCE

Subcontractor Initials

THEREWITH, HE SHALL PROMPTLY NOTIFY CONTRACTOR IN WRITING.  IF SUBCONTRACTOR PERFORMS ANY WORK CONTRARY TO SUCH LAWS, ORDINANCES, RULES AND REGULATIONS WITHOUT SUCH NOTICE TO CONTRACTOR, HE SHALL BEAR ALL COSTS ARISING THEREFROM.

25.    **TAXES:**  SUBCONTRACTOR WILL PAY ALL SOCIAL SECURITY AND OTHER TAXES IMPOSED UPON HIM AS AN EMPLOYER IN CONNECTION WITH THE PERFORMANCE OF THIS SUBCONTRACT, AND WILL FURNISH EVIDENCE, WHEN REQUIRED BY CONTRACTOR SHOWING THAT ALL SUCH PAYMENTS REQUIRED TO BE MADE HAVE BEEN PAID.  SUBCONTRACTOR SHALL PAY ALL LOCAL, STATE AND FEDERAL TAXES IN CONNECTION WITH HIS WORK.

26.    **PERSONNEL:**  CONTRACTOR'S POLICY ON DRUGS, ALCOHOL AND OTHER PROHIBITED ITEMS SHALL BE A PART OF THIS SUBCONTRACT AS IF INCORPORATED HEREIN.  A COPY OF THE POLICY IS AVAILABLE FOR YOUR REVIEW IN THE CONTRACTOR'S OFFICE AT 1901 REGAL ROW, DALLAS, TEXAS.  THE SUBCONTRACTOR SHALL BE RESPONSIBLE FOR THE COST OF ANY DRUG TESTING REQUIRED BY SAID POLICY.

**THIS SUBCONTRACT CONTAINS AN INDEMNITY PROVISION.**

IN WITNESS WHEREOF, THE PARTIES HAVE EXECUTED THIS SUBCONTRACT AGREEMENT EFFECTIVE THE DATE HEREIN FIRST ABOVE WRITTEN.

**CONTRACTOR**
**ROGERS-O'BRIEN CONSTRUCTION COMPANY, LTD.**

BY: _____

TITLE: _Client Director_

DATE: _1/19/12_

**SUBCONTRACTOR**

BY: _____

TITLE: _PRESIDENT_

DATE: _10/31/2011_

Subcontractor Initials _____

# EXHIBIT "A"
## SCOPE OF WORK

## A. Special Scope Conditions:

1. Subcontractor to attend a pre-construction meeting before beginning their work. This meeting must be attended by the subcontractor's on-site project supervision.

2. All original scope submittals and shop drawings must be received by Rogers-O'Brien prior to first draws being paid. These submittals must be approved and coordinated prior to ordering any materials. All as-built documents, warranties, O&M Manuals, Close-Out Documents, etc. must be submitted and approved by Rogers-O'Brien before final payment will be made.

3. All OSHA and Rogers-O'Brien safety regulations and requirements will be adhered to by this subcontractor.

4. No existing systems are to be tied into or shut down without proper notification to Rogers-O'Brien. No "hot" work will be allowed and proper tag-out/lock-out procedures will be followed at all times.

5. Documents shall be at this subcontractor's expense. Sets may be purchased from Thomas Reprographics; Phone Number (972) 620-1861; project is listed as Plaza at Preston Center Office Tower and Garage.

6. Trash disposal in dumpsters provided by Rogers-O'Brien unless noted otherwise in **B. Scope Specific Conditions** below.  Traffic to and from dumpsters will be as directed by Rogers-O'Brien Construction.

7. Parking is offsite and this subcontractor's responsibility.

8. Designated off-load areas will be provided by Rogers-O'Brien – this subcontractor is responsible for coordinating all deliveries with-in allotted time frames. This subcontractor to provide flagmen as required for this scope of work.

9. Subcontractor is to remember that all work will be in and around active businesses. Professional behavior and language is to be used at all times. Failure to adhere to this policy is grounds for immediate dismissal of person and or subcontractor.

10. Subcontractor acknowledges and agrees to the limited working conditions defined in Exhibit E "Special Requirements."

11. Subcontractor acknowledges that surrounding businesses and restaurants are deemed as "off limits" to construction personnel. No shopping, dining or loitering will be tolerated.

12. Subcontractor is to take special care in limiting the noise caused by this scope of work.

13. Subcontractor is to be conscious of any odors (solvents, cleaners, etc.) either created during or needed to complete this scope of work. All applicable items must be approved by Rogers-O'Brien prior to commencing work.

14. Subcontractors mark-up for change order shall be limited to 15%. A complete labor, material and quantity take off will be required with all change orders. Providing changes are made to contract scope while still performing original contract scope, rates used to price scope must tie back to the rates provided during the original bid proposal. No contractor is to proceed with any extra work dealing with additional cost, without verbal approval from Rogers-O'Brien's Project Manager.

15. The current construction schedule provided by Rogers-O'Brien described in Exhibit Z is a part of this subcontract. Liquidated damages are a part of this subcontract they relate to delays under this subcontractor's direct control; damages are as follows:
    - $1,500.00/day for 1-10 days beyond 12/19/12
    - $3,000/day for 11-30 days beyond 12/19/12
    - $5,000/day for 31-45 days beyond 12/19/12
    - Consequential damages after 45 days beyond 12/19/12

    It is this subcontractor's responsibility to maintain their schedule for work as it is adjusted from time to time, including manpower, overtime, equipment, light towers if working at night and shift work. It is the intent of Rogers-O'Brien to pick up time on the schedule where possible. If revised schedules adversely deviate from original schedule and or sequence of work, subcontractor may require change order.

16. Unless noted otherwise in **B. Scope Specific Conditions** below, this subcontractor shall be responsible for the hoisting or hauling of all his material furnished under this subcontract.

Subcontractor Initials

17. A detailed schedule of values will be required for this project to be submitted on the AIA G703 form. This schedule of values shall be separated between Site, Tower & Garage.

18. This subcontractor acknowledges the Geotechnical Report as well as all specifications and shall be responsible for all requirements as related to this scope of work.

19. This subcontractor shall present all questions, clarifications, and/or verifications to the General Contractor. The subcontractor will not contact the Owner or the Architect/Engineer for any reason at any time without prior consent from Rogers-O'Brien Construction.

20. Rogers-O'Brien Construction will hold scheduled job-site coordination and safety meetings throughout the duration of the project. It is mandatory that subcontractor attend these meetings as required by R-O personnel.

21. This subcontractor is responsible for protecting his work and repairing any damages that he causes to other trades work.

22. Subcontractor is responsible for maintaining proper clearances per the contract documents and governing codes.

23. All work in this scope is to be based on the latest applicable City of University Park Construction Standards.

24. This subcontractor is responsible for notifying and coordinating with all appropriate authorities prior to construction. Use extreme caution working around all underground/overhead utilities.

25. Mobilization and sequencing of all work shall be as directed by the project superintendent.

26. This subcontractor is responsible for engineering and layout. Rogers-O'Brien will provide control.

27. This subcontractor shall be responsible for protection of existing erosion control devices and the replacement of any of these devices damaged while performing this scope of work.

28. This subcontractor is responsible for keeping all streets cleaned as it pertains to his scope of work.

29. This subcontractor is responsible for dewatering as it pertains to his scope of work.

30. This subcontractor shall be responsible for the clean up as required to maintain a clean and safe workplace. This shall include cleaning of streets as required due to tracking through construction entrances. If necessary, this shall also include providing one (1) person per week as directed by Rogers-O'Brien's Superintendent.

31. This subcontractor shall furnish a full time qualified supervisor for each discipline at all times his crew is working on the project.

32. The building permit will be provided by others, but this subcontractor shall validate their permitted work as required.

33. Subcontractor agrees to check with Rogers-O'Brien prior to renting any equipment.

34. All subcontractor employees shall be United States citizens or nationals, lawful permanent residents, or aliens properly authorized to work in the U.S. Subcontract shall furnish documentation proving these requirements upon request.

35. The subcontractor shall, if in the performance of this scope it becomes necessary, convenient or advisable to remove, replace or interfere with any safety devices or controls installed by others or another subcontractor, replace or restore such devices or controls at their expense. In the event such safety devices or controls are not so replaced or restored, the subcontractor shall reimburse Rogers-O'Brien for the costs of doing so for the subcontractor's account.

36. Subcontractor acknowledges that this project will utilize 3-D Modeling as described in Exhibit W and agree to 100% compliance.

Subcontractor Initials

**B. Trade Specific Scope of Work:**

This contract is for all labor, material and equipment necessary to complete the Steel on the above referenced project in accordance with plans, specifications, city ordinances and code. Scope shall include, but not necessarily be limited to:

Steel Scope:

| | |
|---|---|
| Base Bid: | $466,000.00 |
| Delete Stairs and handrails at Stair 6: | ($14,400.00) |
| Delete Elevator 4 Pit Ladder and Sump Grate: | ($1,500.00) |
| Standard Bollards ILO Extra Strong: | ($8,800.00) |
| Add for Erection: | $160,500.00 |
| Add Full Guardrails at Stairs 3, 4, and 5: | $14,800.00 |
| Good Faith Cut | ($1,600.00) |
| Total Contract Amount: | $615,000.00 |

1. Metal grate for exhaust shaft and intake area way (ref. A-001 and A-102)
2. Site Bollards (ref A-001, A-010, 10/A-011)
3. Steel Service Gate (ref. A-010; 4,13,14/A-011)
4. Bollards for Garage including embeds.
5. Garage Stairs 3,4, and 5 including any engineering as required to provide a complete stair system (ref. A-411 and A-414)
6. Building stairs 1 & 2 including engineering as required (ref. A-410 and A-413)
7. Library Lobby Stair #7 including engineering as required.
8. Elevator spreader beam for elevator 1 & 2 shaft.
9. Bathroom countertop supports level 3-5 (ref. 07, 11/A-131)
10. Roof Trellis system (ref. A-107, 05/A-510, A-520, S-209)
11. Subcontractor acknowledges and shall adhere to the architectural steel notes on A-201.
12. Steel framing for library canopy (ref. A-201, A-521, S-204)
13. Steel tube at outrigger (ref. A-401)
14. Elevator pit ladders and sump grates (ref. 17/A-415)
15. Stair embeds as required.
16. Elevator hoist beams and embeds as required.
17. Elevator sill angle (ref. 10/A-415)
18. Steel plate for awning attachment w/ S.S. screws (ref. A-510)
19. Subcontractor acknowledges and shall adhere to structural steel notes on S-101.
20. Roof Penthouse framing (ref. 2/S-208)
21. Window washing pipe embeds (ref. 3/S-310)
22. Vertical bracing as required (ref. 10 and 18/S-310)
23. CMU embeds and clip angles (ref. 12/S-401)
24. Cooling tower support beams and embeds (9/S-310)
25. Penthouse roof deck
26. Elevator Rail Supports (ref. 20/S-501)
27. Curtainwall embeds
28. Any and all loose lintels as required.
29. Continuous Angle at Stud Framing
30. Anchor Bolts/Embeds
31. CMU Head Support
32. Subcontractor acknowledges and shall adhere to the details shown on sheets S-501 and S-502.

Subcontractor Initials

SUBCONTRACT DOCUMENT CHECK LIST

JOB NAME: Case 3:22-cv-00917-K   Document 1   Filed 04/25/22   Page 59 of 59   PageID 59

JOB NAME: PLAZA @ PRESTON CENTER (TOWE & GARAGE)   JOB 11011   SUBCONTRACT # 11011-05 015

SUBCONTRACTOR NAME: Red Steel Co.

PROJECT MANAGER: WILL PENDER          JOINT CHECK    YES    NO

| ITEM | DESCRIPTION | SENT |
|---|---|---|
| EXHIBIT A | CONTRACT DOCUMENTS | YES |
| EXHIBIT C | INSURANCE CERTIFICATE SAMPLE | YES |
| | AIA G703 SCHEDULE OF VALUES | YES |
| | LIST OF SUPPLIERS | YES |
| | PARTIAL LIEN WAIVER/PAY REQUEST | YES |
| | SCHEDULE | NO |
| | QUALIFICATION | |
| | | |

| DESCRIPTION | Orig DATE | Final DATE | INITIAL |
|---|---|---|---|
| SUBCONTRACT RECEIVED FROM PROJECT MANAGER FOR DISTRIBUTION | — | 9/7 | ₤ |
| CCIP NOTICE OF SUBCONTRACT AWARD SENT TO MHBT | | — | — |
| QUALIFICATION SHEET FAXED | — | — | — |
| QUALIFICATION SHEET RECEIVED | — | — | — |
| QUALIFICATION SHEET REVIEWED | — | | |
| LOGIN, ASSIGN NUMBER, PROOF, PRINT, ATTACH ENCLOSURES, MAKE COPIES FOR JOB FILE, JOB COST, ACCOUNTING, & SUPERINTENDENT, DELIVER/ MAIL | — | 9/7 | ₤ |
| INSURANCE CERTIFICATE RECEIVED FROM SUBCONTRACTOR | — | 1/18 | ₤ |
| INSURANCE ENDORSEMENTS RECEIVED FROM SUBCONTRACTOR | — | | — |
| SIGNED SUBCONTRACT RECEIVED FROM SUBCONTRACTOR | — | 1/2 | ₤ |
| PROJECT MANAGER APPROVAL | — | | — |
| CONTROLLER APPROVAL | — | — | |
| Leon Davis GARY STEELE SIGNATURE | | 1/19 | LD |
| FILE SUBCONTRACT, INSURANCE CERTIFICATE & ROUTE SLIP | | 1/19 | SC |

Comments:

No Changes

CREDIT COMMENTS:

BEST INSURANCE RATING: